UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                            )
ROBERT G. HAMMOND, et al.,                  )
                                            )
              Plaintiffs,                   )
                                            )
      v.                                    )        Civil Action No. 01-2345 (PLF)
                                            )
GALE A. NORTON, et al.,                     )
                                            )
              Defendants.                   )
_____)


OPINION

## I.   INTRODUCTION

This case, brought under the National Environmental Policy Act ("NEPA") and

other federal environmental statutes, arises from decisions of the Bureau of Land Management

("BLM") and other federal agencies facilitating the construction of a refined petroleum products

pipeline from Bloomfield, New Mexico to Salt Lake City, Utah.  Comprising 220 miles of

natural gas pipeline proposed to be converted to petroleum products use and 260 miles of newly

constructed pipeline, the pipeline traverses primarily private lands but also crosses the Manti-

LaSal and Uinta National Forests.  Defendant-Intervenor, the Williams Pipe Line Company

("Williams"), a common carrier of petroleum products, seeks by construction of this pipeline to

provide access to the potentially lucrative petroleum products market in Salt Lake City.

Primarily at issue in this case is the relationship between the proposed Williams

pipeline and another proposed pipeline, set to run from Odessa, Texas to Bloomfield, New

Mexico.  The proponent of that project, Equilon Pipeline LLC ("Equilon"), formerly was

partnered with Williams in a joint venture to construct a single pipeline encompassing both of the proposed segments and running all the way from West Texas to Salt Lake City.  The full pipeline would connect Salt Lake City to the national petroleum products grid, including high-capacity refineries in West Texas and shipping terminals on the Texas Gulf Coast.

When BLM, the agency primarily responsible for reviewing applications for rights-of-way for utility corridors across federal lands, made it clear to Equilon and Williams that, for purposes of NEPA environmental review, BLM would consider the entire proposed Odessa to Salt Lake City pipeline as a single project, rather than two separate endeavors, Williams and Equilon terminated the joint venture and applied separately for rights-of-way to construct their respective pipelines across federal lands.  BLM ultimately granted Williams' application for a right-of-way after preparing a final environmental impact statement ("FEIS") that did not address the environmental impacts of the proposed Equilon pipeline.

Plaintiffs in this case are Sinclair Oil, a petroleum products company with a current presence in the Salt Lake City market; several environmental groups concerned with pipeline safety;[1] and individuals owning land on or near the proposed Williams pipeline route. The plaintiffs raise a host of claims, foremost among which is the assertion that BLM improperly limited the scope of the Williams FEIS to exclude the Equilon pipeline, allowing the impact of the Equilon project to be considered in a separate environmental review process and preventing the full environmental impacts of the combined projects from being considered adequately in the ROW decision-making process.  Plaintiffs also assert other defects in the FEIS and claim that

---

[1]     These groups are Forest Guardians, Living Rivers, the Utah Environmental Congress, and Citizens for Safe Pipelines.

BLM was required by law to prepare a supplemental environmental impact statement ("SEIS") based on information that came to light after the issuance of the FEIS.  Plaintiffs raise additional claims under the Endangered Species Act, the Mineral Leasing Act, and the National Forest Management Act.

Before the Court are two sets of cross-motions for partial summary judgment and defendant-intervenor Williams Pipe Line Company's motion to dismiss Count 13 of the amended complaint.  As provided in this Court's Order of March 31, 2005, the Court granted summary judgment for plaintiffs on Count 1 of their amended complaint, which alleges that BLM improperly segmented its environmental analysis of the Williams project, and remanded the matter to BLM for the preparation of a Supplemental Environmental Impact Statement addressing only the issue of whether the Williams and Equilon pipeline projects are "connected actions" under 40 C.F.R. § 1508.25(a)(1).  The Court granted summary judgment for defendants on all other counts.  This Opinion explains the reasoning underlying the Court's Order of March 31, 2005.

## II.   BACKGROUND

### A.   *History of the Williams, Equilon, and Aspen Projects*

This case arises from defendant-intervenor Williams Pipe Line Company's effort to construct a petroleum products pipeline providing access to the Salt Lake City, Utah petroleum products market.  Salt Lake City historically has been isolated from the national petroleum products grid.  At the time the Williams project was initiated, nearly all the refined petroleum products in the state of Utah were supplied by five small in-state refineries and one Wyoming

refinery owned by plaintiff Sinclair Oil.  As a result, prices for gasoline and other petroleum products in Utah are considerably higher than they are in most parts of the country connected to the national grid.  Williams asserts that if the Utah market were connected to the massive refineries on the Texas Gulf Coast, competition would increase and prices would drop considerably.

Williams proposes to build a petroleum products pipeline connecting the Salt Lake City area with Bloomfield, New Mexico, a town near the "Four Corners" area (where Utah, New Mexico, Arizona, and Colorado meet), which also is not currently connected to the national petroleum products grid.  Two hundred twenty miles of the line would be converted from an existing natural gas pipeline extending from Bloomfield to Crescent Junction, Utah.  The 260-mile section from Crescent Junction to Salt Lake City, however, would consist of newly constructed pipe, 96.95 miles of which would traverse federal lands, including the Manti-LasSal and Uinta National Forests.  See U.S. Department of the Interior, Record of Decision for the Williams Petroleum Products Pipeline Project (Oct. 12, 2001) ("Oct. 2001 ROD") at 1, A.R. vol. 6 at 123.

The Mineral Leasing Act, 30 U.S.C. §§ 181 *et seq.*, requires Williams to obtain a right-of-way ("ROW") from the Bureau of Land Management, a subdivision of the Department of the Interior ("DOI"), before it can construct, operate, or maintain a pipeline on federal lands.[2]

---

[2]       BLM generally is responsible for processing grants of rights-of-way ("ROW") across federal lands.  43 C.F.R. § 2882.2-2.  As such, BLM was the lead agency in preparation of the Environmental Impact Statement for the Williams project, with the United States Forest Service and the Federal Energy Regulatory Commission as cooperating agencies.  See FEIS § 1.3 at 1-4 to 1-6.  It was DOI, however, that ultimately approved the Williams ROW application. See Oct. 2001 ROD at 1, A.R. vol. 6 at 123; 30 U.S.C. § 185(c)(2); 43 C.F.R. § 2882.3(j).

Williams filed an initial ROW application with the Utah office of BLM in 1998.  See Oct. 2001

ROD at 1, A.R. vol. 6 at 128.  Although that application pertained only to the segment of the

pipeline running from Thompson Springs, Utah to the Salt Lake City area, the application stated

that this pipeline segment was part of a larger project to build a pipeline extending all the way

from southeast Texas to "the Wasatch Front area of Utah," in the vicinity of Salt Lake City.  See

Supplement to Application for Transportation and Utility Systems and Facilities on Federal

Lands (Nov. 6, 1998) ("Nov. 1998 Williams Application") at 1, A.R. vol. 1 at 324.  A separate

application for the New Mexico segment of the project was to be filed with BLM in Farmington,

New Mexico.  See id.

In February 1999, Williams and another company, Equilon Pipeline LLC, formed

a joint venture, Aspen Products Pipeline LLC ("Aspen"), to construct a petroleum products

pipeline from Odessa, Texas to Salt Lake City.  See Defendant-Intervenors' Statement of Points

and Authorities in Opposition to Plaintiffs' Motion for Partial Summary Judgment and in

Support of Motion for Summary Judgment and Motion to Strike ("Def-Intervs'. Opp. 1st Mot.

Summ. J.") at 3-4.  A March 15, 1999 amendment to the Williams ROW application

redesignated Aspen as the proponent of the project and extended the northern terminus of the line

slightly.  See id. at 4; Letter from John R. Thomas to Mark Mackiewicz (March 15, 1999), Re:

Williams Pipe Line Company Revised Right-of-Way Application, A.R. vol. 1 at 235.  Also under

the aegis of Aspen, Equilon filed a ROW application with the New Mexico office of BLM for the

southern segment of the pipeline, running from Odessa, Texas, to Bloomfield.[3]

---

[3]        Shell Pipeline Company, the successor-in-interest to Equilon, is now the project
proponent on the pipeline segment from Odessa to Bloomfield.  See Notice of Availability of the
Draft Environmental Impact Statement for a Proposed Refined Petroleum Products Pipeline

The National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq*., provides that a federal agency must prepare an environmental impact statement for "proposals for . . . major federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C); see also 40 C.F.R. § 1502.3.  NEPA and its implementing regulations require the agency preparing an EIS to consider carefully the scope of its analysis, defined by Council on Environmental Quality ("CEQ") regulations as  "the range of actions, alternatives, and impacts to be considered in an environmental impact statement."  40 C.F.R. § 1508.25.[4]  Actions that are "connected" or "cumulative" in impact should be discussed in the same environmental impact statement; actions that are "similar" *may* be analyzed in the same statement. 40 C.F.R. § 1508.25(a).

After meeting with Williams and Equilon, and over the companies' strenuous objections, BLM decided that rather than prepare separate EIS's for the northern and southern segments of the pipeline, BLM would for NEPA purposes examine the entire Aspen pipeline from Odessa to Salt Lake City as a single project.  See Letter from Sally Wisely, Director, Utah Office of BLM, to Tim Powell, Williams Energy Services (Feb. 1, 2000) ("Feb. 2000 Wisely Letter"), A.R. vol. 8 at 449.  The Environmental Protection Agency, the Council on Environmental Quality, Sinclair Oil (a plaintiff here), and other interested parties also had submitted comments urging BLM to examine the entire Aspen project in a single EIS.  See

---

Right-of-Way Across Land in Lea, Eddy, Chaves, Lincoln, Guadalupe, Torrance, Sandoval, McKinley and San Juan Counties, NM; Ector and Winkler Counties, TX, 68 Fed. Reg. 16546, 16546 (Apr. 4, 2003).

[4]     CEQ is the agency responsible for promulgating NEPA implementing regulations of general applicability.  See 42 U.S.C. § 4342.

Statement of Uncontested Facts in Support of Motion of Plaintiffs and Plaintiff-Intervenors for

Partial Summary Judgment ("Pls'. Facts") ¶¶ 8-13.  Because the two segments were to be

considered as part of a single environmental review process, construction of either segment could

not begin until environmental review of the entire pipeline was completed.

As a direct consequence of BLM's decision to prepare a single EIS, in March

2000 Williams and Equilon decided to terminate the Aspen joint venture and construct separately

the northern and southern segments of the proposed pipeline.  Williams filed another amended

application to "clarify" that its pipeline would end in Bloomfield and that Williams would "no

longer include Equilon's proposed pipeline as an alternative source of supply" for its line.  See

Letter from Tim Powell to Sally (March 8, 2000) ("Mar. 2000 Powell Letter"), A.R. vol. 8 at

451.  Williams further requested that its ROW application be reviewed independently of any

ROW application filed by Equilon.  Id.  The amended ROW application described the proposed

project as "a pipeline to transport refined petroleum products from Bloomfield, New Mexico to

the Wasatch Front area of Utah."  See Application for Transportation and Utility Systems and

Facilities on Federal Lands, Amended, March 2000 (March 8, 2000), A.R. vol. 8 at 458.  Equilon

also filed an amended ROW for its segment of the pipeline, still proposed to extend from Odessa

to Bloomfield.  See Pls'. Facts ¶ 18.

On April 19, 2000, DOI published in the Federal Register a notice of intent to

proceed with an EIS addressing the Williams pipeline, as well as natural gas pipelines proposed

by Questar Pipeline Company ("Questar") and Kern River Gas Transmission Company ("Kern"),

which would traverse largely the same route across federal lands as the Williams line. See 65

Fed. Reg. 21006 (April 19, 2000).[5]  After notice and public comment, on February 9, 2001, BLM

completed the draft environmental impact statement ("DEIS") for the Williams project.  See

Williams, Questar, & Kern River Pipeline Projects: Draft Environmental Impact Statement

(March 2001) ("DEIS"), A.R. vol. 2 at 1.  The DEIS did not include analysis of the

environmental effects of the Equilon proposal.

> The omission of Equilon from the DEIS elicited negative comments from

numerous parties, including some of the plaintiffs in this action.  The EPA, required by NEPA

and the Clean Air Act to comment on the action, see 42 U.S.C. § 7609; 42 U.S.C. § 4332(2)(C),

objected to the DEIS on this and other grounds.  In an April 16, 2001, letter to BLM submitted

during the notice and comment period, EPA raised the issue of "segmentation" in the DEIS:

> The DEIS needs to analyze additional connected actions that would
> include impacts related to the Equilon pipeline. . . . EPA was
> informed by BLM and public individuals that these two "separate
> projects" were once proposed as one project. . . . BLM and
> Williams have not provided any information in the DEIS such as
> information on supply contracts that would support the argument
> that the two pipelines are not connected.

See Letter from Cynthia Cody, Chief, NEPA Unit, Ecosystems Protection Program, EPA to

LaVerne Steah, Project Manager, Bureau of Land Management (April 16, 2001) ("Apr. 2001

Cody Letter") at 5, A.R. vol. 8 at 66.

> On June 1, 2001, BLM issued a final environmental impact statement for the

Williams project.  See Plaintiffs' Amended Complaint ("Am. Compl.") ¶ 8.  The FEIS

acknowledged the receipt of many public comments arguing for the consideration of the

---

[5]    BLM decided to analyze the three projects together because they would occupy
the same utility corridor across the Manti-La Sal and Uinta National Forests, would follow
similar construction timeframes, and could cause cumulative impacts. See DEIS § 1.1 at 1-1.

Williams and Equilon pipelines in a single EIS on the grounds that they were either "connected" or "cumulative" actions.  See Final Environmental Impact Statement for the Questar, Williams, & Kern River Pipeline Project (June 1, 2001) ("FEIS") § 1.8.2.4 at 1-30.  BLM defended its decision to analyze the projects separately, however, on four grounds.  First, "the Williams project would not automatically trigger other actions that require environmental impact statements," as the Equilon project and its environmental analysis already were underway.  Id.  Second, "[t]he Williams project can and would proceed regardless of whether other actions are taken previously or simultaneously. . . . Williams has stated that it can acquire a supply of products for its pipeline even if the Equilon project is not constructed."  Id.  Third, "[t]he Williams project is not an interdependent part of a larger action and depends on the larger action for its justification."  Finally, although BLM "acknowledge[d] that the Equilon project is a related or foreseeable project, . . . [t]he area of geographic overlap between the two projects is very small, and the potential additive effects on resources are very limited."  Id.

On June 20, 2001, EPA sent a letter to BLM requesting documentation supporting the argument that the Equilon and Williams pipelines were not connected projects, and pointing out that "the only difference" between the single Aspen application and the separate Williams/Equilon applications "is that the two companies have dissolved the previous [partnership] agreement.  CEQ does not require a formal agreement in order for two projects to be defined as connected actions."  See Letter from Cynthia Cody, Chief, NEPA Unit, Ecosystems Protection Program, EPA to LaVerne Steah, Project Manager, Bureau of Land Management at 2 (June 20, 2001) ("June 2001 Cody Letter"), A.R. vol. 8 at 69-70.  BLM received no further written communication from EPA on the DEIS or FEIS.

9

Relying on the environmental analysis in the FEIS, on June 5, 2001, the Fish and Wildlife Service ("FWS") issued a Biological Opinion on the effect of the Williams project on numerous plant and animal species in the project area, in accordance with Section 7 of the Endangered Species Act, 16 U.S.C. §§ 1531 *et seq*. The Biological Opinion concluded that the Williams project would not have adverse effects on most of the species considered, and that the pipeline "may affect, but is not likely to adversely affect the endangered Colorado pikeminnow, razorback sucker, humpback chub, and bonytail in Colorado." See Final Formal Section 7 Consultation for the Utah Portion of the Williams Pipe Line Company Proposed Pipeline Extending From Bloomfield, New Mexico to Salt Lake City, Utah (June 5, 2001) ("Bio. Op.") at 1-2, A.R. vol. 6 at 35. FWS premised this conclusion partially on Williams' commitment to numerous measures designed to minimize the impact of pipeline construction and operation on listed species. Id. at 2.

The required environmental reviews having been substantially completed, Williams needed the approval of one more agency before it could obtain a ROW from BLM. The National Forest Management Act, 16 U.S.C. §§ 1600 *et seq.*, requires preparation of a Land and Resource Management Plan ("Forest Plan") governing the management of resources in each national forest. The existing plan for the Manti-La Sal National Forest, enacted in 1986, provided for a 200 to 500 foot wide utility corridor through the forest, in which underground pipeline facilities might be constructed. See Defendants' Memorandum of Points and Authorities in Support of Cross-Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment (March 7, 2003) ("Defs'. 2d Mot. Summ. J.") at 3-4. The FEIS for the Williams, Questar, and Kern projects, however, had identified substantial landslide risks

in certain areas crossed by this utility corridor and recommended re-routing the proposed

pipelines around these areas.  <u>See</u> FEIS §§ 2.3.3 to 2.4 at 2-62 to 2-66.  Use of this route,

however, would require amendment of the Manti-La Sal Forest Plan to reroute portions of the

utility corridor.

On July 5, 2001, the United States Forest Service ("USFS"), a division of the

United States Department of Agriculture ("USDA"), issued a Record of Decision ("ROD") with

respect to the Questar and Kern natural gas pipelines, approving the relocation of two segments

of the utility corridor to allow short segments of the natural gas pipelines to be re-routed to avoid

landslide-prone areas.  <u>See</u> Record of Decision and Finding of Non-Significant Amendment for

the Manti-LaSal and Uinta National Forest Land and Resource Management Plan Amendments

(July 5, 2001) ("July 2001 ROD"), A.R. vol. 3 at 410.  Although it considered the "cumulative

effects" of the Williams pipeline proposal, the July 2001 ROD "[did] not make a decision

regarding the location of a utility corridor for the refined petroleum products pipeline (Williams)

proposal."  <u>See</u> July 2001 ROD at 2.

On August 3, 2001, USFS issued another ROD amending the Manti-La Sal Forest

Plan to allow the Williams petroleum products pipeline to follow the same amended corridor as

the two natural gas pipelines.  <u>See</u> Record of Decision and Finding Non-Significant Amendment

for the Manti-La Sal National Forest Land and Resource Management Plan Amendment (August

3, 2001) ("Aug. 2001 ROD"), A.R. vol. 5 at 407.  As part of this ROD, USFS made a "Finding of

Non-Significant Amendment" ("FONSA") pursuant to former 36 C.F.R. § 219.10(f) (1997)

(amended Jan. 5, 2005), allowing amendment of the Forest Plan by means of an expedited

administrative process, rather than the extended procedure required for development and

11

approval of a new forest plan.  See Aug. 2001 ROD at 6.  Plaintiffs administratively appealed the

Forest Service ROD, but their appeal was denied on June 26, 2002.  See Letter from Elizabeth G.

Close, Acting Deputy Regional Forester, to Melvin Goldstein (June 26, 2002), A.R. vol. 52 at

550-53; Federal Defendants' Memorandum of Points and Authorities in Support of Cross-Motion

for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment (May 23,

2003) ("Fed. Defs'. 2d Mot. Summ. J.") at 9.

Finally, on October 12, 2001, DOI issued a Record of Decision granting

Williams' request for a right-of-way.  The ROD considered many of the environmental impacts

analyzed in the FEIS, and "adopt[ed] many stringent measures to minimize risks [resulting] in a

project that reduces risks to an acceptable level that is within the petroleum products industry's

norms."  See Oct. 2001 ROD at 9.

### B.   *Proceedings in this Court*

On November 9, 2001, plaintiffs filed a complaint for declaratory and injunctive

relief against BLM, DOI, and officials thereof.  The complaint asserted eleven claims under

NEPA, the Administrative Procedure Act, the Mineral Leasing Act, the Endangered Species Act,

and the Forest Management Act, and asked the Court to enjoin any further action with respect to

the Williams pipeline pending preparation of a revised EIS and ROD.  On November 28, 2001,

the Court granted Williams' motion to intervene as a defendant.  With the consent of the existing

parties to the action, Carol Parker and Citizens for Safe Pipelines, Inc. ("CSP") were allowed to

intervene as plaintiffs on March 18, 2002.

The federal defendants filed the administrative record supporting the challenged decisions on February 15, 2002, but the record has since been supplemented numerous times by additional submissions from both sides.  The Court also granted, in part, plaintiffs' request to conduct limited discovery to complete the administrative record, to allow plaintiffs the opportunity to substantiate claims of bad faith by BLM in its environmental review of the Williams project.  See Memorandum Opinion and Order (July 31, 2002).

On March 25, 2002, plaintiffs and plaintiff-intervenors filed a motion for partial summary judgment on Counts 1 through 8 of the complaint.[6]  Defendants and defendant-intervenors filed cross-motions seeking summary judgment on all counts on April 29, 2002. Williams' cross-motion also asked the Court to strike certain affidavits submitted by plaintiffs because they were outside the administrative record, and not subject to any exception to the general rule that in NEPA cases the Court's review should be limited to the administrative record.  See Def-Intervs'. Opp. 1st Mot. Summ. J. at 8-10.[7]

In July 2002, plaintiffs and plaintiff-intervenors sought and were granted leave to amend their complaints to add additional claims and to join USFS as an additional defendant. Counts 14, 15, and 16 challenge the legality of USFS's August 2001 ROD under the National Forest Management Act, 16 U.S.C. §§ 1600 *et seq.*, and the Forest Service's own regulations,

---

[6]     Plaintiffs inadvertently omitted Count 5 from the list of claims on which they requested summary judgment in their March 2002 motion.  In a subsequent filing, plaintiffs asked that the Court treat the initial motion as requesting summary judgment on Count 5, as well. In the interest of dealing with all the claims outstanding in the case, the Court will grant plaintiffs' request.

[7]     Williams' motion to strike was granted in part and denied in part in a Memorandum Opinion and Order issued on March 31, 2005.

including the "Roadless Area Rule" restricting the construction of roads in certain designated

areas of National Forests.  The amended complaint also accuses BLM of acting arbitrarily and

capriciously in refusing to prepare a supplemental EIS for the Williams project, which plaintiffs

claim was necessitated by factual developments since preparation of the FEIS.  On November 1,

2002, Williams filed a motion to dismiss this count (Count 13) for failure to state a claim, under

Rule 12(b)(6) of the Federal Rules of Civil Procedure.

On January 23, 2003, plaintiffs and plaintiff-intervenors filed another motion for

partial summary judgment, this time on Counts 12 through 16 of the amended complaint.

Defendants and defendant-intervenors again filed cross-motions for summary judgment on all

claims.  Pending before the Court, then, are the parties' and intervenors' six motions for

summary judgment and Williams' motion to dismiss Count 13 of the amended complaint.

## III.   DISCUSSION

### A.   *Standard of Review*

Under the Administrative Procedure Act ("APA"), a reviewing court may only set

aside agency actions, findings, or conclusions when they are arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A).  An agency action is

arbitrary and capricious if an agency has "entirely failed to consider an important aspect of the

problem, offered an explanation for its decision that runs counter to the evidence before the

agency, or is so implausible that it could not be ascribed to a difference in view or the product of

agency expertise."  Motor Vehicle Mfrs'. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29,

42 (1983).  Especially in complex, technical areas, there is a strong presumption in favor of

upholding agency decisions.  See Marsh v. Oregon Natural Resources Council, 490 U.S. 360,

375-78 (1989).  Nonetheless, a reviewing court must undertake a "thorough, probing, in-depth

review" of the agency's decision and then decide whether it was "based on a consideration of the

relevant factors and whether there has been a clear error of judgment."  Citizens to Preserve

Overton Park v. Volpe, 401 U.S. 402, 415-16 (1971).  Review of agency action generally "is to

be based on the full administrative record that was before the [agency] at the time [it] made [its]

decision."  Id. at 420.  If the agency has "considered the relevant factors and articulated a rational

connection between the facts found and the choice made," its decision must be upheld.

Baltimore Gas & Elec. Co. v. Natural Resources Defense Counsel, 462 U.S. 87, 105 (1983).[8]

> For challenges to an agency's construction of the statutes that it administers, the

Court's review must be particularly deferential. The Court must defer to the agency's

interpretation of a statute that it implements "so long as it is reasonable, consistent with the

statutory purpose, and not in conflict with the statute's plain language." OSG Bulk Ships v.

United States, 132 F.3d 808, 814 (D.C. Cir. 1998) (quoting Coal Employment Project v. Dole,

889 F.2d 1127, 1131 (D.C. Cir. 1989)); see Chevron U.S.A. v. Natural Resources Defense

Council, 467 U.S. 837, 845 (1984); Davis v. Latschar, 83 F. Supp.2d 1, 5 (D.D.C. 1998), aff'd,

202 F.3d 359 (D.C. Cir. 2000).

---

[8]     Summary judgment is an appropriate procedure for resolving a challenge to a
federal agency's administrative decision when review is based upon the administrative record,
even though the Court does not employ the standard of review set forth in Rule 56 of the Federal
Rules of Civil Procedure.  Richards v. I.N.S., 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977);
Fund for Animals v. Babbitt, 903 F.Supp. 96, 105 (D.D.C. 1995).  Because of the Court's
consideration of the administrative record, and because both plaintiffs and the federal defendants
have filed motions for summary judgment as to Count 13, the Court will treat Williams' motion
to dismiss that count as a motion for summary  judgment.  See FED. R. CIV. P. 12(b).

An agency's interpretation of its own regulations also is entitled to substantial deference by the courts.  Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994); Wyoming Outdoor Council v. United States Forest Serv., 165 F.3d 43, 52 (D.C. Cir. 1999).  Unless "plainly erroneous or inconsistent with the regulation," the agency's construction of its own regulation is controlling.  United States v. Larionoff, 431 U.S. 864, 872 (1977); see also Stinson v. United States, 508 U.S. 36, 45 (1993); Wyoming Outdoor Council v. United States Forest Serv., 165 F.3d at 52; Everett v. United States, 158 F.3d 1364, 1367 (D.C. Cir. 1998);  Amerada Hess Pipeline Corp. v. Federal Energy Regulatory Comm'n,117 F.3d 596, 600 (D.C. Cir. 1997); Davis v. Latschar, 83 F. Supp.2d at 5.  The Court does not, however, owe any deference to BLM's interpretation of NEPA or CEQ regulations "because NEPA is addressed to all federal agencies and Congress did not entrust administration of NEPA to the [BLM] alone."  Grand Canyon Trust v. Federal Aviation Admin., 290 F.3d 339, 342 (D.C. Cir. 2002).

## B.   *NEPA Claims (Counts 1-6, 8, 12-13)*

Plaintiffs argue that the FEIS prepared by BLM fails in a variety of ways to comply with NEPA's requirements.  Plaintiffs claim that because the Forest Service's July 2001 and August 2001 RODs amending the Manti-LaSal Forest Plan, and DOI's ROD granting Williams' ROW application all relied on the FEIS, a finding of insufficiency in the preparation of the FEIS calls into question each of these decisions.[9]

---

[9]      Count 8 of the Amended Complaint makes the general claim that DOI acted arbitrarily and capriciously in relying on the flawed EIS.  See Am. Compl. ¶¶ 252-57.  Because each of the alleged defects in the FEIS (and DOI's reliance thereon) is raised in a separate count, the Court need not address Count 8 independently.

16

NEPA requires that all "proposals for 'major federal action' 'significantly affecting the quality of the environment' must be accompanied by a detailed discussion of the reasonably foreseeable effects on the environment of reasonable alternative courses of action." Taxpayers Watchdog v. Stanley, 819 F.2d 294, 298 (D.C. Cir. 1987) (quoting Natural Resources Defense Council v. U.S. Nuclear Regulatory Comm'n, 606 F.2d 1261, 1269 (D.C. Cir. 1979)). This requirement is "essentially procedural"; as long as the agency's decision is "fully informed" and "well-considered," it is entitled to judicial deference.  Natural Resources Defense Council v. Hodel, 865 F.2d 288, 294 (D.C. Cir. 1988) (quoting North Slope Borough v. Andrus, 642 F.2d 589, 599 (D.C. Cir. 1980) and Izaak Walton League of America v. Marsh, 655 F.2d 346, 371 (D.C. Cir. 1981)).  The Court's role is to ensure that the agency takes a "hard look" at the environmental consequences of an action, not to interject its own judgment as to the course of action to be taken.  Kleppe v. Sierra Club, 427 U.S. 390, 410 & n.21 (1976); see also Nat'l Committee for the New River v. Federal Energy Regulatory Comm'n, 373 F.3d 1323, 1327 (D.C. Cir. 2004) ("An environmental impact statement is reviewed to 'ensure that the agency took a hard look at the environmental consequences of its decision to go forward with the project.'").[10]

---

[10]     Although plaintiffs claim in Count 7 of their Amended Complaint that BLM failed to conduct its environmental analysis of the Williams Project in good faith, these allegations are unsubstantiated by the administrative record or by the additional materials filed in this litigation.  See infra at 66-69.

1.   Purpose and Need for the Williams Project and Consideration of No Action Alternative
(Counts 2-4)

NEPA and CEQ regulations require every EIS to consider the "purpose and need" for the proposed action.  According to the regulations, "[t]he statement shall briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action." 40 C.F.R. § 1502.13.  Count 2 of the amended complaint asserts that BLM violated NEPA and the CEQ regulations "by approving the Williams project without properly assessing the purpose and need of the project," in that it "failed to assess and analyze uncontradicted data that demonstrates that the petroleum products requirements of Salt Lake City would be satisfactorily met for the next ten years even in the absence of the Williams petroleum pipeline project."  See Am. Compl. ¶¶ 213-19.[11]

Specifically, plaintiffs claim that BLM's consideration of the purpose and need for the project relied entirely on a December 2000 economic study undertaken by the Utah Office of Energy and Resource Planning ("UOERP"), demonstrating that the Williams pipeline would be necessary to alleviate future supply imbalances in petroleum products in the Salt Lake City market.  See Am. Compl. ¶ 95.  The study's supply calculations, plaintiffs assert, failed to reflect the recent expansion of an existing pipeline from Sinclair, Wyoming to Salt Lake City or the ability of Utah refineries to expand their production capacity to meet future demand.  Plaintiffs claim that an updated UOERP study reflecting this new information was presented to BLM in May 2001, and that BLM improperly ignored this new information in the preparation of the June

_____

[11]   Count 2 also asserts that DOI acted arbitrarily and capriciously in relying on the flawed FEIS.

2001 FEIS.  See id. ¶¶ 96-97.  Had BLM considered this information, plaintiffs argue, it would

have been forced to conclude that the Williams project was "economically infeasible."  See id.

¶ 98.  The public notice and comment period for the draft EIS, however, had ended on April 16,

2001, weeks before this additional information was submitted to BLM.  See Draft EIS for a

Refined Petroleum Products Pipeline, Natural Gas Pipelines and Utility Corridor Analysis and

Plan Amendments, 66 Fed. Reg. 11311, 11311 (Feb. 23, 2001).  The Court concludes that the

FEIS, released on June 1, 2001, is not defective for failing to incorporate this last-minute

submission because the submission was presented after the close of the comment period.  DOI, in

turn, did not err in relying on the FEIS, and Count 2 of plaintiffs' amended complaint fails.

In Counts 3 and 4 of the amended complaint, plaintiffs assert that in preparing the

FEIS, BLM failed adequately to discuss the "no action alternative" to constructing the Williams

pipeline, and that DOI improperly failed to select it.  See Am. Compl. ¶¶ 220-31; Pls'. Part. Mot.

Summ. J. at 29.  Plaintiffs assert that BLM was compelled to adopt this alternative because

"there is no justifiable basis on which BLM could have reasonably concluded that the Williams

project should succeed."  Am. Compl. ¶ 229.

In addition to "specify[ing] the underlying purpose and need to which the agency

is responding," an agency preparing an EIS must "rigorously explore and objectively evaluate all

reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly

discuss the reasons for their having been eliminated."  40 C.F.R. §§ 1502.13, 1502.14.  The

courts have recognized that these requirements are interrelated because "the goals of an action

delimit the universe of the action's reasonable alternatives."  City of Burlington v. Busey, 938

F.2d 190, 195 (D.C. Cir. 1991). The setting of the objectives and the range of alternatives to be

considered by an agency are governed by a "rule of reason." City of Grapevine v. U.S. Dept. of Transp., 17 F.3d 1502, 1506 (D.C. Cir. 1994); City of Burlington v. Busey, 938 F.2d at 195.  All that NEPA requires is that the agency weigh all reasonable alternatives and come to a fully-informed decision.  Davis v. Latschar, 83 F. Supp.2d at 8 (citing Strycker's Bay Neighborhood Council v. Karlen, 444 U.S. 223, 227-28 (1980)).

The "reasonable alternatives" an agency must consider in preparing an EIS must include the alternative of taking no action whatsoever.  40 C.F.R. § 1502.14.  The purpose of discussing the "no action alternative" is "to facilitate reader comparison of the beneficial and adverse impacts of other alternatives to the applicant doing nothing."  40 C.F.R. § 6.203(c).  The Council on Environmental Quality has provided some guidance as to what the No Action Alternative discussion should include:

> [I]n instances involving federal decisions on proposals for projects[,] "No action" . . . would mean the proposed activity would not take place, and the resulting environmental effects from taking no action would be compared with the effects of permitting the proposed activity or an alternative activity to go forward. Where a choice of "no action" by the agency would result in predictable actions by others, this consequence of the "no action" alternative should be included in the analysis. For example, if denial of permission to build a railroad to a facility would lead to construction of a road and increased truck traffic, the EIS should analyze this consequence of the "no action" alternative.

Council on Environmental Quality, *Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations*, 46 Fed. Reg. 18026 (March 23, 1981) (pagination unavailable).

BLM's discussion of the no action alternative for the Williams pipeline proceeds by recapitulating the possible negative effects of pipeline construction and, by extension, the environmental effects that would *not* occur absent pipeline construction, and then concludes:

> Based on [the UOERP study], there appears to be a current and projected need for additional petroleum products along the Wasatch Front.  If the Williams project is not constructed, deficits are predicted for diesel by the year 2013, and for gasoline, jet fuel, and all other petroleum products starting in 2001.  These annual deficits would increase over time and the total deficit for petroleum products would be about 10 million barrels by the year 2020. Hence, the purpose and need would not be met.

See FEIS § 3.2 at 3-101.  Given the FEIS's prior analysis of the project's environmental impacts, as well as its consideration of the project's "purpose and need," this discussion, while brief, lays out the costs and benefits of the no action alternative with enough specificity to allow meaningful comparison with other alternatives.  No more is required.

Plaintiffs' argument that DOI acted arbitrarily and capriciously by failing to select the no action alternative misconceives the nature of NEPA's mandate, which prescribes a process, not an outcome.  Again, "NEPA's requirements are 'essentially procedural'; as long as the agency's decision is 'fully informed' and 'well-considered,' it is entitled to judicial deference and a reviewing court should not substitute its own policy judgment."  Natural Resources Defense Council v. Hodel, 865 F.2d at 294 (quoting North Slope Borough v. Andrus, 642 F.2d at 599); see also Strycker's Bay Neighborhood Council v. Karlen, 444 U.S. at 227; Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Counsel, 435 U.S. 519, 558 (1978) ("NEPA does set forth significant substantive goals for the Nation, but its mandate to the agencies is essentially procedural."); Louisiana Ass'n of Independent Producers and Royalty

Owners v. Federal Energy Regulatory Comm'n, 958 F.2d 1101, 1117 (D.C. Cir. 1992).  BLM's

explanation of the likely effects of the Williams project, positive and negative, satisfied this

procedural requirement and enabled DOI to make an informed judgment about the project.  That

plaintiffs disagree with the outcome of DOI's decision does not render either DOI's or BLM's

conduct of the process arbitrary or capricious.

> 2.   Consideration of Adverse Environmental Impacts (Count 5)

Plaintiffs claim that the FEIS failed adequately to address a number of the

Williams Project's adverse environmental effects, including the impact on watersheds along the

pipeline route, the risk to communities and natural resources in the event of a landslide or

earthquake, the risk of fire or explosion, and the impact of the project on sensitive plant and

animal species.  See Am. Compl. ¶¶ 111-18, 232-38.

CEQ regulations require an agency preparing an EIS to consider the "direct,"

"indirect," and "cumulative" impacts of a proposed action.  40 C.F.R. § 1508.25.  "Effects

includes ecological (such as the effects on natural resources and on the components, structures,

and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health,

whether direct, indirect, or cumulative."  40 C.F.R. § 1508.8.

Plaintiffs' claims in this respect are patently without merit, as BLM discussed

each of these effects in the FEIS.  See, e.g., FEIS § 3.1.5 at 3-64 to 3-70 ("Water Resources");

FEIS § 3.1.4 at 3-56 to 3-64 ("Landslide Hazards"); FEIS § 3.1.1.2 at 3-9 ("Probability of Fire");

FEIS § 3.1.6 at 3-70 to 3-78 ("Threatened, Endangered, and Sensitive Species").  Beyond the

conclusory statements in their Amended Complaint, plaintiffs give no explanation why these

analyses are insufficient.  Absent such an argument, the Court cannot find BLM's discussion of

environmental effects in the FEIS to have violated NEPA.

3.    Consideration of Socioeconomic Impact (Count 6)

Plaintiffs also seek to take BLM to task for failing in the FEIS to address the

socioeconomic impact of the Williams project.  They claim that completion of the Williams

pipeline would have a "drastic impact" on the economies of both Bloomfield and Salt Lake City,

see Pls'. Part. Mot. Summ. J. at 31-32, and that it was arbitrary and carpricious for BLM to

complete the FEIS without consideration of these effects.  See Am. Compl. ¶¶ 238-43.

Defendants have two responses.  First, NEPA requires consideration of socioeconomic factors

only to the extent that "'economic or social and natural or physical environmental effects are

interrelated,'" and that socioeconomic impacts unrelated to environmental effects therefore are

outside the scope of NEPA.  See Defs'. Opp. Part. M. Summ. J. at 17 (citing Tongass

Conservation Society v. Cheney, 924 F.2d 1137, 1144 (D.C. Cir. 1991), and 40 C.F.R.

§ 1508.14).  Second, BLM did "consider[] potential social and economic impacts along the

pipeline route," including environmental justice issues and potential effects of pipeline

construction on employment, income, taxes, and local housing markets.  See Defs'. Opp. Part. M.

Summ. J. at 17-18.

CEQ regulations state that "[w]hen an environmental impact statement is prepared

and economic or social and natural or physical environmental effects are interrelated, then the

environmental impact statement will discuss all of these effects on the human environment."  40

C.F.R. § 1508.14 (emphasis added).  Nonetheless, "economic or social effects are not intended

by themselves to require preparation of an environmental impact statement."  Id.  Only when

socioeconomic effects somehow result from a project's environmental impact must they be

considered.  Whether an impact on the "human environment" must be addressed depends on

"the closeness of the relationship between the change in the environment and the 'effect' at

issue."  Metro. Edison Co. v. People Against Nuclear Energy, 460 U.S. 766, 771-72 (1983); see

also Ass'n of Pub. Agency Customers v. Bonneville Power Admin., 126 F.3d 1158, 1186 (9th

Cir. 1997) (agency not required to examine possible social effects of utilities being forced to pay

higher stranded costs and passing those costs on to lower income consumers).

   The socioeconomic effects plaintiffs urge consideration of are "(i) major supply

disruptions that could occur if the operation of the Williams pipeline forced closure of local Salt

Lake City refineries; (ii) the impact of job losses associated with these possible closures; and

(iii) the harm that could result from supply shortages if the gasoline and diesel fuel supplies on

which Bloomfield currently relies were diverted to the Williams pipeline."  Am. Compl. ¶ 240.

There is no relationship between these economic problems and the *environmental* impacts of the

Williams project; rather, they flow solely from Williams' proposed introduction of petroleum

products into the Salt Lake City market.  Indeed, these effects could easily follow even if the

Williams pipeline had *no* environmental impacts.  Consequently, they are outside the scope of

NEPA, and, to the extent it declined to consider them, BLM's action was entirely reasonable.

4.    Segmentation of the EIS (Count 1)

Count 1 of plaintiffs' complaint asserts that BLM violated NEPA by failing to evaluate the impact of the Williams and Equilon pipeline projects in a single EIS, and that DOI acted arbitrarily and capriciously in relying on the flawed EIS in its ROD.  See Am. Compl. ¶¶ 204-12.  NEPA and CEQ regulations dictate in general terms the proper scope of "actions, alternatives, and impacts to be considered in an environmental impact statement." 40 C.F.R. § 1508.25.  Actions that are "similar" or "connected" or that have cumulative effects must be considered together in one EIS.  40 C.F.R. § 1508.25(a).  Plaintiffs claim that because the Williams and Equilon projects are "similar" and "connected," and have "cumulatively significant environmental effects," BLM violated NEPA and CEQ regulations by deciding not to prepare an EIS considering both actions.  See Motion of Plaintiffs and Plaintiffs-Intervenors for Partial Summary Judgment (March 25, 2002) ("Pls'. 1st Mot. Summ. J.") at 24-26.

It is established that an agency preparing an EIS may not "segment" its analysis so as to conceal the environmental significance of the project or projects.  Coalition on Sensible Transportation v. Dole, 826 F.2d 60, 68 (D.C. Cir. 1987).  "The purpose of this requirement is to prevent agencies from dividing one project into multiple individual actions 'each of which individually has an insignificant environmental impact, but which collectively have a substantial impact.'"  Natural Resources Defense Counsel v. Hodel, 865 F.2d at 297-98 (quoting Thomas v. Peterson, 753 F.2d 754, 758 (9th Cir. 1985)); see also Taxpayers Watchdog v. Stanley, 819 F.2d at 298 ("'Piecemealing' or 'Segmentation' allows an agency to avoid the NEPA requirement that an EIS be prepared for all major federal actions with significant environmental impacts by dividing an overall plan into component parts, each involving action with less significant

environmental effects."). An agency's decision not to prepare a comprehensive EIS, like other

asserted violations of NEPA, is reviewed under the "arbitrary and capricious" standard.

Environmental Defense Fund v. Higginson, 655 F.2d 1244, 1247 & n.8 (D.C. Cir. 1981) (citing

Kleppe v. Sierra Club, 427 U.S. at 412 and National Wildlife Federation v. Appalachian

Regional Comm'n, 677 F.2d 883, 891 (D.C. Cir. 1981))

   The administrative record in this case demonstrates clearly (and the parties do not

dispute) that Williams and Equilon deliberately sought to segment the environmental analysis of

the Aspen project so as to circumvent NEPA requirements. As they informed BLM in early 2000

(before dissolution of the Aspen partnership), it was the project proponents' expectation that if

the segments were considered separately, there would be a finding of no significant impact with

respect to the southern segment, allowing only an environmental assessment to be performed for

that portion of the pipeline. See Jan. 2000 Steah Letter, A.R. vol. 8 at 314 ("The proponents . . .

would like for BLM to consider doing an EA in [New Mexico] followed by an EIS in Utah. . . . If

only the southern part were analyzed, it is likely that there would be a finding of no significant

impact determination. Because of this, the proponent would like to see it analyzed in a separate

NEPA document.").[12]

_____

  [12] An agency considering a proposed action may, under NEPA, opt to prepare a less-
detailed "environmental assessment" rather than a full EIS. 40 C.F.R. §§ 1501.3, 1501.4(a) &
(b), 1508.9. The environmental assessment is a preliminary inquiry to determine whether the
proposed action is a major activity having significant effects on the environment. If the agency
determines that no EIS is required, it must report its decision in a "finding of no significant
impact" ("FONSI"). 40 C.F.R. §§ 1501.4(e), 1508.13. If it determines that the proposed action
does have a significant effect on the environment, it then must prepare an environmental impact
statement. 40 C.F.R. § 1501.4; see also Anacostia Watershed Soc'y v. Babbitt, 871 F.Supp. 475,
481-82 (D.D.C. 1994).

   In this case, contrary to the proponents' expectations, the New Mexico office of

BLM initially determined that the entire Aspen project needed to be analyzed in a single EIS. If the dissolution of the Aspen partnership was nothing more than a formal measure taken to avoid this requirement, and had no practical significance, it likely would have been impermissible for BLM not to have prepared a comprehensive EIS. See Natural Resources Defense Counsel v. Hodel, 865 F.2d at 297-98. On the other hand, if the dissolution of the Aspen partnership so changed the nature of the proposed project that the Equilon and Williams pipelines were no longer similar or connected, and no longer had any cumulative effects, then regardless of the parties' original intent BLM might legitimately have concluded that no comprehensive EIS was necessary.

Based on the administrative record, the Court concludes that plaintiffs have failed to demonstrate that the two projects have cumulative effects or are so "similar" as to require preparation of a combined EIS. The Court does find, however, that BLM acted arbitrarily in deciding, on the basis of the information in the administrative record at the time BLM prepared the FEIS, that the Equilon and Williams projects were not "connected" actions under 40 C.F.R. § 1508.25(a)(1).

---

BLM ultimately determined that an environmental assessment would be insufficient to fulfill NEPA's requirements, and required preparation of a full EIS for the Odessa to Bloomfield pipeline. Nonetheless, separating the two project components has allowed each to proceed on its own timeline, so that litigation regarding the Williams EIS would not impede progress on the Equilon project.

a.   Cumulative Effects

When actions "will have cumulative or synergistic environmental impact upon a region" and "are pending concurrently" before an agency, "their environmental consequences must be considered together."  Kleppe v. Sierra Club, 427 U.S. at 410; see also 40 C.F.R. § 1508.25(a)(2).  "Cumulative impacts" are those impacts "that result[] from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency . . . or person undertakes such other actions."  40 C.F.R. § 1508.7.  The identification of cumulative effects is a task committed "to the special competency" of the agency preparing an EIS.  Kleppe v. Sierra Club, 427 U.S. at 413.

Although plaintiffs argue that the Williams and Equilon projects have cumulative or synergistic environmental effects, they posit only one example of such an effect:  the possibility that the 16-inch Equilon line will deliver enough petroleum products to allow the Williams pipeline to run at a capacity higher than 76,000 barrels per day ("bpd"), the normal flow contemplated by the FEIS.  See Reply Brief of Plaintiffs and Plaintiff-Intervenors in Support of Their Summary Judgment Motion and Statement of Points and Authorities in Opposition to Summary Judgment Motions Filed by Federal Defendants and Williams Pipe Line Company, LLC (May 20, 2002) ("Pls'. Rep. 1st Mot. Summ. J.") at 22-23.  If the Williams pipeline were to transport a significantly greater volume of products each day, plaintiffs claim, the risk of pipeline rupture or spills would increase.  Plaintiffs, however, provide no reason to expect that the Williams pipeline would experience such high throughput.  The FEIS indicates that, although the Williams pipeline would be capable of transporting 100,000 bpd of petroleum

28

products, Williams represented to BLM that "this throughput rate would occur infrequently," and the pipeline would generally transport only 76,000 bpd.  See FEIS § 2.1.1.2 at 2-7.

"The starting point in any analysis of an agency's compliance with . . . NEPA is the 'rule of reason,' under which a federal agency proposing a major action must consider only the reasonably foreseeable environmental effects of the action."  Potomac Alliance v. United States Nuclear Regulatory Comm'n, 682 F.2d 1030, 1035 (D.C. Cir. 1982).  Environmental impact statements need not address "remote and highly speculative consequences."  San Luis Obispo Mothers for Peace v. United States Nuclear Regulatory Comm'n, 751 F.2d 1287, 1300 & n.63 (D.C. Cir. 1984) (quoting Trout Unlimited v. Morton, 509 F.2d 1276, 1283 (9th Cir. 1974)); see also Concerned About Trident v. Rumsfeld, 555 F.2d 817, 829 (D.C. Cir. 1977) ("NEPA does not mandate that every conceivable possibility which someone might dream up must be explored in an EIS.").  In this case, there is no reason to expect that the Williams pipeline would operate at a throughput higher than that proffered by Williams and contemplated in the FEIS.  Absent any evidence to the contrary, the Court concludes that BLM did not act unreasonably in relying on the project proponent's claim.

Plaintiffs also attempt – unsuccessfully, in the Court's view – to characterize other effects of the Williams and Equilon projects as "cumulative" or "synergistic" effects.  For example, they characterize Williams' possible reliance on the Equilon line as a supply source as a cumulative impact.  See Pls'. 1st Mot. Summ. J. at 25.  Although this reliance might demonstrate the connectedness of the two projects, and could lead to environmental impacts, it does not by itself constitute the kind of "compounded effect on the region" contemplated by the NEPA regulations, as interpreted by the Supreme Court and our court of appeals.  See National Wildlife

29

Federation v. Appalachian Region Mountain Comm'n, 677 F.2d at 888 (citing Kleppe v. Sierra Club, 427 U.S. at 410).  It therefore is not a cumulative effect requiring analysis under NEPA and 40 C.F.R. § 1508.25.

Plaintiffs further claim that synergistic effects are demonstrated by the fact that the proposed termini of the Williams and Equilon pipelines are in close proximity to each other. See Pls'. 1st Mot. Summ. J. at 25-26.  BLM acknowledged this proximity in the FEIS, but dismissed the possibility that it would result in cumulative or synergistic effects, pointing out that in the area where the two pipelines would draw near, the Williams and Equilon projects involve not new pipeline construction but conversion of existing lines, and consequently that the "[s]urface disturbance effects of both projects in the area around Kunz Station, New Mexico are very small."  See FEIS Table 4-1 at 4-6.  Plaintiffs have provided no reason to question the sufficiency of BLM's conclusion in this respect.  The Court therefore will not disturb the agency's determination that the Equilon project would not result in any cumulative or synergistic effects.

b.   Similar Actions

Plaintiffs also argue that the FEIS should have considered the effects of the Equilon project because it and the Williams pipeline are "similar actions."  See Pls'. 1st Mot. Summ. J. at 26.  "Similar actions" are those that, "when viewed with other reasonably foreseeable or proposed agency actions, have similarities that provide a basis for evaluating their environmental consequences together, such as common timing or geography."  40 C.F.R.

§ 1508.25(a)(3).  An agency "may wish" to prepare a programmatic EIS for any group of similar actions, but "should" do so if a programmatic EIS is "the best way" to assess their combined environmental effects.  40 C.F.R. § 1508.25(a)(3); see also Foundation on Economic Trends v. Heckler, 756 F.2d 153, 159 (D.C. Cir. 1985).  Plaintiffs maintain that "similar actions" must *always* be considered in a combined EIS, but make no attempt to demonstrate (beyond their arguments with respect to independent utility and combined effects) that doing so would be "the best way" to analyze the effects of the Williams and Equilon projects.  See Pls'. 1st Mot. Summ. J. at 26.

Although the FEIS does not address explicitly whether the Williams and Equilon pipelines are "similar projects," it does establish that the two projects are on separate timelines, and that their geographic overlap is minimal.  See FEIS § 1.8.2.4 at 1-30.  Beyond their geographic proximity and the fact that "[t]he two projects would likely be completed within a few years at the very most" – circumstances acknowledged and discussed in the FEIS –  plaintiffs make no argument as to why the Williams and Equilon lines are similar projects.  Moreover, plaintiffs make no attempt to demonstrate (beyond the arguments advanced under 40 C.F.R. § 1508.25(a)(1) and (2)) that a combined EIS would be the "best way" to assess the projects' combined environmental impacts.  Absent any such argument, the Court cannot consider BLM's refusal to prepare a programmatic EIS as arbitrary and capricious under 40 C.F.R. § 1508.25(a)(3).

c.   Connected Actions

Finally, plaintiffs claim that the Williams and Equilon pipelines are "connected actions" under 40 C.F.R. § 1508.25(a)(1), and that by refusing to consider both projects in one EIS, BLM improperly segmented its analysis.  They argue that the Equilon and Williams projects were not intended to function independently but are in effect two segments of a single pipeline designed to transport petroleum products from West Texas to Salt Lake City.  See Pls'. 1st Mot. Summ. J. at 15.  The dissolution of the Aspen partnership, plaintiffs maintain, was a mere formality designed to allow Equilon to circumvent the NEPA review process in developing the southern segment of the pipeline, and that BLM's decision to prepare separate environmental impact statements therefore was "inexplicable and irrational."  See id.

Actions are "connected" or "closely related" if they: "(i) Automatically trigger other actions which may require environmental impact statements; (ii) Cannot or will not proceed unless other actions are taken previously or simultaneously; [or] (iii) Are interdependent parts of a larger action and depend on the larger action for their justification."  40 C.F.R. § 1508.25(a)(1).  In determining whether an EIS has been improperly segmented to avoid consideration of connected actions, courts also have considered such factors as "whether the proposed [project] (1) has logical termini; (2) has substantial independent utility; (3) does not foreclose the opportunity to consider alternatives; and (4) does not irretrievably commit federal funds for closely related projects."  Taxpayers Watchdog v. Stanley, 819 F.2d at 298 (citing Piedmont Heights Civic Club v. Moreland, 637 F.2d 430, 439 (5th Cir. 1981)).

While the parties advance a variety of arguments in favor of their respective positions on whether the Williams and Equilon projects were connected actions, most focus on

32

whether the Williams pipeline would have substantial "independent utility" regardless of whether the Equilon project ever was completed.  And this, of course, is the appropriate inquiry:  "The proper question [with regard to independent utility] is whether one project will serve a significant purpose even if a second related project is not built."  Coalition on Sensible Transportation v. Dole, 826 F.2d at 69.

Two aspects of the project's independent utility are at issue.  First, plaintiffs argue that because of the limited supply of refined petroleum products in Bloomfield (besides the proposed Equilon pipeline, a pipeline terminal operated by Holly Corporation and a Giant Industries refinery are the only petroleum products sources in the area), the Williams pipeline cannot function without being supplied by the proposed Equilon pipeline.  See Pls'. 1st Mot. Summ. J. at 16.  Second, plaintiffs argue that the Williams pipeline has no independent economic utility, because even if Williams were able to obtain supplies of petroleum products in Bloomfield, the high price of those supplies would prevent Williams from selling them at a profit if they were transported to Salt Lake City.  See id. at 18.

Even though the parties devote a good deal of attention to the latter issue – whether the Williams pipeline would have independent economic utility in light of  the petroleum products price situation in Bloomfield – the Court finds that it need not separately address that question.  Plaintiffs' argument that BLM acted arbitrarily and capriciously in concluding that the project was economically feasible is essentially the same as that advanced with regard to the purpose and need for the project, and already rejected by the Court.  See supra at 18-21.  Although the economic utility of the Williams project as it exists independent of the

Equilon project is a slightly different inquiry, it depends entirely on whether Williams would likely be forced to rely on the Equilon pipeline for supply.

The crux of plaintiffs' argument about the independent practical utility of the Williams pipeline is that BLM's conclusion that the Williams pipeline would have alternative sources of supply was unjustifiable because the only facts in the administrative record to support it were Williams' unsubstantiated assurances to that effect.  Plaintiffs also argue that BLM's failure to respond adequately to EPA's request for substantiation of Williams' claims was itself arbitrary and capricious.  In response, defendants maintain that BLM was justified in relying on Williams' representations, and under no obligation to second-guess Williams or to investigate its claims independently.  They also argue that plaintiffs accord "undue significance" to EPA's objections to the DEIS and FEIS, that those objections were unwarranted, and, in any event, that BLM responded adequately to EPA's comments.  See Def-Intervs'. Opp. 1st Mot. Summ. J. at 27-28.  On the facts established by the record in this case – including Williams' own statements to BLM and representations made by two potential suppliers, EPA's comments on the issue of Williams' source of supply, and other circumstances that should have given BLM reason to doubt Williams' representations – the Court concludes that BLM's finding of independent utility was unsupportable.

While Williams originally had applied to BLM for a pipeline ROW allowing it to construct only the northern segment of a pipeline to Salt Lake City, in February 1999 Williams and Equilon formed the Aspen partnership, which subsequently was designated the project proponent for a pipeline running all the way from Odessa, Texas to Salt Lake City.  See Def-

Intervs'. Opp. 1st Mot. Summ. J. at 3-4.[13]  The partners explicitly informed BLM that if the agency decided to prepare a single, comprehensive EIS for the entire project, the Aspen partnership would be dissolved and the two companies would develop the northern and southern segments of the pipeline independently.  See Letter from LaVerne Steah to Sally Wisely (Jan. 6, 2000) ("Jan. 2000 Steah Letter"), A.R. vol. 8 at 314-15.  Nonetheless, BLM determined that it would prepare a single, programmatic EIS for the entire pipeline.  See Feb. 2000 Wisely Letter, A.R. vol. 8 at 449.  After BLM announced its decision, Williams and Equilon dissolved the Aspen joint venture.  Williams filed an amended ROW application in its own name for a pipeline starting in Bloomfield, claiming that Williams would "no longer include Equilon's proposed pipeline as an alternative source of supply" for its line, and requesting that its ROW application be reviewed independently of any ROW application filed by Equilon.  See Mar. 2000 Powell Letter, A.R. vol. 8 at 451.

Although BLM considered preparing a single EIS for the entire pipeline even after Williams and Equilon filed their separate ROW applications, BLM published in the Federal Register a notice of intent to proceed with an EIS encompassing only the Williams, Questar, and Kern River pipelines.  65 Fed. Reg. 21006 (April 19, 2000).  Thereafter, Equilon filed an amended ROW application for its segment of the pipeline, proposed to extend from Odessa to Bloomfield.  See Pls'. Facts ¶ 18; see also Letter from Daniel J. Nerbonne, Equilon Pipeline Company LLC, to Ron Montagna, BLM (March 10, 2000), A.R. vol. 8 at 176.

---

[13]     Separate applications were filed with the Utah and New Mexico offices of BLM for the northern and southern segments, respectively.

BLM's decision to consider the Williams and Equilon projects independently was predicated largely on the dissolution of the Aspen partnership and Williams' assurances that it no longer would rely on Equilon to supply its Bloomfield to Salt Lake City pipeline.  BLM proceeded on the assumption that Williams would obtain supplies from the Holly Corporation and Giant refineries, the only other significant sources of petroleum products in the Bloomfield area.  See E-mail from LaVerne Steah to Joe Incardine (April 7, 2000), A.R. vol. 48 at 508a ("Williams will no longer be getting a supply source from Equilon.  Navajo (Holly Corporation) and Giant refineries will be their supply source."); FEIS § 1.7.2.4 at 1-23.

In response to a concerned letter from Congressman James V. Hansen, chairman of the House Subcommittee on National Parks and Public Lands, BLM Acting Director Tom Fry reported BLM's conclusion that the Williams and Equilon pipelines were not "connected actions," in part because the Williams pipeline would have independent utility because Williams had entered into supply agreements with two unnamed sources in the Bloomfield area.  See Letter from Tom Fry to Congressman James V. Hansen (May 25, 2000), A.R. vol. 8 at 333; Letter from Congressman James V. Hansen to Tom Fry (April 14, 2000), A.R. vol. 11 at 40. After public comment from several individuals contesting this characterization, however, Williams acknowledged that it had *not* in fact secured any such supply contracts in Bloomfield. See Letter from Jeffery Selvidge, Williams Pipe Line Company, to Sally Wisely (Sep. 15, 2000), A.R. vol. 48 at 484-85.  Moreover, both Holly Corporation and Giant Industries had, in prior communications with BLM, denied entering into any supply contracts with Williams.  See Letter

from Clint W. Ensign, Sinclair Oil Corporation, to Sally Wisely (Sep. 5, 2000) ("Sep. 2000 Ensign Letter"), A.R. vol. 9 at 270.[14]

Nonetheless, the Draft Environmental Impact Statement released by BLM in March 2001, relying on Williams' statements that it would "obtain supplies for its common-carrier pipeline from a pipeline interconnection with the Giant refinery and potentially from a storage terminal owned by Navajo Refining in Bloomfield," concluded that the Equilon and Williams pipelines were not connected actions. DEIS § 1.7.2.4 at 1-26. The DEIS acknowledged, however, that "the Equilon pipeline could provide a future supply source to the Williams pipeline." Id.

In April 2001, EPA submitted to BLM comments on the DEIS, as required by NEPA and Section 309 of the Clean Air Act. See Apr. 2001 Cody Letter at 5, A.R. vol. 8 at 66; 42 U.S.C. § 7609(a). Among other things, EPA expressed concern that BLM had provided insufficient documentation to substantiate Williams' claims of independent utility for the northern segment of the pipeline. EPA noted that the history of the Aspen project provided good reason to believe that the Williams and Equilon projects were in fact connected actions, and that there was no record documentation, "such as supply contracts, that would support the argument that the two pipelines are not connected." See Apr. 2001 Cody Letter, A.R. vol. 8 at 62-68.

---

[14]     Holly Corporation informed BLM that Williams had not secured any supply agreement at Bloomfield for products from the Navajo pipeline on December 10, 1999. See Pls'. Rep. 1st Mot. Summ. J. at 11; Sep. 2000 Ensign Letter, A.R. vol. 9 at 270, 273. A representative of Giant informed BLM that Giant had no supply arrangement with Williams at Bloomfield on September 5, 2000. See id. at 270-71.

BLM did not respond publicly to EPA's concerns.[15]   Neither did it provide any documentation of Williams' supply arrangements in response to a July 2000 FOIA request by Carol Parker, one of the plaintiffs in this action.   BLM's response to Ms. Parker's request for documentation was to assert, without further explanation, that "[w]e cannot provide copies of the contractual agreements between Williams and supply sources in support of the independent utility standing."   See Letter from Sally Wisely to Carol Parker (Aug. 21, 2000), A.R. vol. 9 at 268 ("Aug. 2000 Wisely Letter").[16]

---

[15]      The Acting Director of the Utah office of BLM did send a letter to EPA on August 30, 2001, suggesting that EPA and BLM had resolved their differences over the proper scope of the EIS in a conference call on July 3, 2001, and that EPA's objection to the scope of the DEIS was predicated on a "factual misunderstanding" about the ROW applications.   See Letter from Sally Wisely to Cynthia Cody (Aug. 30, 2001) ("Aug. 2001 Wisely Letter"), A.R. vol. 10 at 203.   Plaintiffs characterize the letter as a fabrication designed to justify BLM's failure to respond publicly to EPA's comments.   The conference call, however, is irrelevant regardless of what was discussed; the FEIS was issued in June 2001, before that call ever took place.   The Court will not consider such post hoc rationalizations where no rationale for the decision was set forth before.   See Carlton v. Babbitt, 900 F. Supp. 526, 531 (D.D.C. 1995).   Moreover, in light of the fact that no written communication from EPA ever followed, the Court can give little weight to this second-hand report of a telephone conversation by an interested party.

[16]      In briefing on its first motion for summary judgment, Williams argued that because it is a common carrier pipeline subject to the Interstate Commerce Act, it could not, as a practical matter, enter into binding supply contracts until it had published a rate schedule and filed it with the Federal Energy Regulatory Commission.   See Defendant-Intervenor's Reply to Plaintiffs' Opposition to Cross-Motion for Summary Judgment at 5-7 & n.6 (June 10, 2002) (citing 18 C.F.R. §§ 341.0(b) and 341.11(a)).   This justification for Williams' failure to demonstrate specific supply commitments does not appear in the FEIS (or in any portion of the administrative record cited by the parties), and also seems to contradict both the FEIS's assertion that the Williams pipeline would be supplied from its pipeline interconnection with the Giant refinery, FEIS § 1.7.2.4 at 1-23, and Williams' July 2001 claim that it had obtained a letter of intent from a supply source with connections in Bloomfield.   See Letter from Douglas D. Copley to Sally Wisely (July 30, 2001) ("July 2001 Copley Letter"), A.R. vol. 49 at 247-49.   The Court cannot consider this argument.   When reviewing an agency's justification for its actions, the Court "may not entertain post hoc rationalizations where no rationale was set forth before." See Carlton v. Babbitt, 900 F. Supp. at 531; see also Motor Vehicles Mfrs. Ass'n v. State Farm Mutual Auto Ins. Co., 463 U.S. at 48-49 ("An agency's action must be upheld, if at all, on the

Despite EPA's expression of concern as to the scope of the DEIS, as well as numerous submissions raising the issue of segmentation during the notice and comment period on the DEIS, BLM did not provide in the FEIS any further substantiation of Williams' alternative supply sources.  See Letter from Dennis Jorgensen, Citizens for Safe Pipelines, to LaVerne Steah (April 11, 2001), A.R. vol. 8 at 246.  In fact, the FEIS's discussion of the Equilon pipeline is identical to that contained in the DEIS, and repeats the inaccurate claim (by that time disavowed by Williams) that the Williams pipeline was to be supplied by the Giant refinery.  Compare FEIS § 1.7.2.4 at 1-23; DEIS § 1.7.2.4 at 1-26.  After publication of the FEIS in June 2001, EPA reiterated its request to BLM for documentation demonstrating that the Equilon and Williams pipelines were in fact separate and independent projects, pointing out that "the only difference" between the single Aspen application and the separate Williams/Equilon applications "is that the two companies have dissolved the previous [partnership] agreement.  CEQ does not require a formal agreement in order for two projects to be defined as connected actions."  See June 2001 Cody Letter at 2, A.R. vol. 8 at 70.  Again, BLM did not respond publicly.

On July 29, 2001, after the issuance of the FEIS, Williams did contact BLM to "confirm discussions with nine industry players to date interested in shipping refined products on the proposed Williams pipeline system," and to "confirm that [Williams] has a letter of intent from one supply source with connections to the infrastructure in Bloomfield, New Mexico."  Williams gave no further details, claiming that these discussions were subject to confidentiality agreements.  See July 2001 Copley Letter, A.R. vol. 49 at 247-49.  Whatever the value of this information, it was not available to BLM when it determined the scope of its environmental

bases articulated by the agency itself," not those articulated in litigation after the fact.).

analysis, or indeed at any time before publication of the FEIS.  Therefore it is irrelevant to

determining whether BLM's scoping decision was arbitrary or capricious at the time it was made.

Neither did DOI discuss any of these post-FEIS communications in its October 2001 ROD

granting the Williams ROW application.

       Prior to the dissolution of the Aspen project, BLM concluded that the Williams

and Equilon segments of the pipeline were connected actions.  It is clear from the record,

however, that during the scoping and preparation of the EIS, Williams provided no new

information to BLM about potential alternative supply sources in Bloomfield.  Although it

afforded general assurances that it had such supply alternatives, these merely echoed assurances

made by Williams since well before the dissolution of the Aspen partnership, and thus were of

little value in determining whether dissolution of the Aspen partnership had materially changed

the facts on the ground.  <u>See</u> Letter from Denise Dragoo to Sally Wisely (Jan. 13, 2000), A.R.

vol. 8 at 317-23 (letter from Williams' counsel asserting that "Aspen has established that the

Northern Project can proceed without the Southern Project.  The Southern Project is but one of

three or four product supply alternatives to the Northern Project, including the Giant Refinery,

Holly Corporation's Navajo Pipeline and the ATA, Chevron Pipeline.").

       Courts have recognized the danger of agencies merely accepting the "self-serving

statements or assumptions" of interested parties in the preparation of EIS's rather than doing

their own analysis and investigation.  <u>Trinity Episcopal Church v. Romney</u>, 523 F.2d 88, 94 (2d

Cir. 1975).  Moreover, while under normal circumstances an agency may rely on information

provided by a project proponent, when the agency has good cause to believe that information is

inaccurate or exaggerated, it has a duty to substantiate it.  <u>Van Abbema v. Fornell</u>, 807 F.2d 633,

642 (7th Cir. 1986) ("The Corps may rely on reports prepared by outsiders or applicants, but as we have noted, when such information is specifically and credibly challenged as inaccurate, the Corps has an independent duty to investigate."). In this case, the history of the Aspen project as a single connected pipeline, and the proponents' manifest intention to circumvent the NEPA review process by segmenting the project, should have given BLM cause to question whether the dissolution of the Aspen partnership was of real or only formal significance.[17]

    This ambiguity could have been remedied by a demonstration that Williams had secured (or was reasonably certain of being able to secure) alternative supply sources in Bloomfield. Instead, BLM relied on the same blanket assurances that Williams had provided before the Aspen partnership dissolved, despite specific denials by Bloomfield's only petroleum products suppliers that any such arrangements existed. The misunderstanding regarding communications with Congressman Hansen (which plaintiffs claim was evidence of Williams' or BLM's bad faith) also called into question the accuracy of Williams' assurances, or at least BLM's understanding thereof.

    The EPA and others brought this problem to BLM and DOI's attention during the notice and comment process, as well as after issuance of the FEIS. BLM's response was to

---

    [17]    Even if BLM had been in possession of confidential information from Williams about the existence of Bloomfield supply sources, the existence of such information could not cure the defects in the FEIS. Materials in the administrative record, but not incorporated in any way into the EIS, cannot bring an otherwise defective EIS into compliance with NEPA. Grazing Fields Farm v. Goldschmidt, 626 F.2d 1068, 1072-73 (1st Cir. 1980); see also National Wildlife Federation v. Marsh, 568 F. Supp. 985, 996-97 (D.D.C. 1983) ("Of great importance to a reviewing court is the distinction to be made between the environmental impact statement and the remainder of the administrative record. . . . Any substantial information pertinent to the cost-benefit analysis or the analysis of alternatives found in the administrative record, but not in the environmental impact statement, would render the impact statement inadequate under NEPA.").

repeat in the FEIS the inaccurate statement in the DEIS that Williams would obtain supplies from

Giant and Holly.  See FEIS § 1.7.2.4 at 1-23.  Although nothing in NEPA requires an agency

preparing an EIS to respond to EPA concerns, BLM's failure even to address them in the EIS at

the very least brings into question the sufficiency of the agency's analysis.  See City of

Burlington v. Busey, 938 F.2d at 201 (agency whose environmental analysis the EPA objects to

"does not have to follow the EPA's comments slavishly – it just has to take them seriously.");

Natural Resources Defense Counsel v. Hodel, 865 F.2d at 297-99 (agency's failure in FEIS to

address meaningfully EPA concerns about cumulative effects analysis in DEIS contributed to

court of appeals' determination that FEIS did not comply with NEPA); Alaska v. Andrus, 580

F.2d 465, 475 (D.C. Cir. 1978) (EPA's determination that the EIS was unsatisfactory "did give

rise to a heightened obligation on [DOI's] part to explain clearly and in detail its reasons for

proceeding.").[18]

       In light of BLM's failure to seek substantiation of Williams' self-serving and

unreliable statements about its petroleum supply arrangements in Bloomfield despite the history

of the Aspen project, as well as BLM's failure to provide any substantive response to EPA's

criticism of the DEIS or FEIS on this ground, the Court concludes that BLM acted arbitrarily and

capriciously in concluding that the Williams pipeline had independent utility and that the Equilon

pipeline was not a connected action under 40 C.F.R. § 1508.25(a).  BLM thus improperly

segmented its analysis of the Williams pipeline project, in violation of NEPA and CEQ

---

[18]     Although the Court notes that, unlike in Alaska v. Andrus, the EPA objection in question here was not the stated basis for the "unsatisfactory" rating assigned to the FEIS (the rating was based on "the lack of alternatives analyzed and additional impacts to roadless areas in the Uinta National Forest"), Apr. 2001 Cody Letter at 2, A.R. vol. 8 at 63, BLM and DOI are nonetheless not free to disregard EPA's comments entirely.

regulations.  Accordingly, the matter must be remanded to the agency for supplementation of the

administrative record and preparation of a supplemental EIS addressing the issue of the whether

the Williams and Equilon pipeline projects are "connected actions" under 40 C.F.R.

§ 1508.25(a)(1).  If BLM is to conclude that they are not connected actions, it must make a more

thorough and factually supportable finding of independent utility than was set forth in the

original Williams FEIS.  Specifically, any finding of independent utility must substantiate, with

record evidence beyond the mere assertions of Williams representatives or BLM personnel, the

existence of reasonably certain alternative petroleum supply sources in Bloomfield, or other

circumstances indicating with reasonable clarity that the Williams pipeline will not rely on the

proposed Equilon pipeline.  See Nat'l Audobon Soc. v. Hoffman, 132 F.3d 7, 18-19 (2d Cir.

1997); United States v. Fox River Marine Servs., 1999 U.S. Dist. LEXIS 4778, *20 (N.D. Ill.

1999) (citing Motor Vehicle Mfrs'. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. at 50-57);

Anacostia Watershed Society v. Babbitt, 875 F. Supp. 1, 2 (D.D.C. 1995).[19]

---

[19]     After issuance of the Court's Order granting summary judgment for plaintiffs on
Count 1 of the complaint on March 31, 2005, defendants moved for alteration or amendment of
judgment, filing in support of their motion an affidavit from Mark Mackiewicz, an official of
BLM's Utah office, claiming that the ROW Application for the Equilon project has been
withdrawn and that the Equilon project has been terminated. See Affidavit of Mark Mackiewicz,
Att. to Federal Defendants' Motion to Alter or Amend Judgment or in the Alternative for Relief
from Judgment ("Mot. Alter J.") (April 14, 2005).  Accordingly, defendants argue, there is no
longer any proposed "action" to which the Williams project might be connected, and plaintiffs'
claim that the FEIS was improperly segmented is now moot.  See Mot. Alter. J. at 4.  Because the
parties cannot address this issue fully until they have reviewed the contents of this Opinion, the
Court will permit supplemental briefing on the motion to alter or amend judgment and will
consider these arguments once those briefs have been filed.

5.    Failure to Prepare Supplemental Environmental Impact Statement (Counts 12 and 13)

In Counts 12 and 13 of the Amended Complaint, plaintiffs argue that BLM violated both NEPA and the Mineral Leasing Act by failing to prepare a supplemental EIS in response to circumstances that emerged after completion of the FEIS.  See Am. Compl. ¶¶ 278-94.  Plaintiffs claim that BLM was obligated to respond with an SEIS to two significant series of events.  First, at some point after issuance of the FEIS, the Holly Corporation substantially expanded the capacity of a petroleum products pipeline running from Artesia, New Mexico (the site of a refinery operated by Holly) to Bloomfield, enabling it to serve as a source of supply for Williams' proposed Bloomfield to Salt Lake City pipeline.  See Am. Compl. ¶¶ 281-82; Statement of Authorities in Support of Plaintiffs and Plaintiffs Intervenors Motion for Summary Judgment on Counts 12 to 16 of the Amended Complaint ("Pls'. 2d Mot. Summ. J.") at 32.[20]

Second, plaintiffs allege that since preparation of the FEIS and issuance of the October 12, 2001 ROD, the financial position of Williams' corporate parent, The Williams Companies, has severely deteriorated, bringing into question Williams' ability to complete the pipeline project and its capacity to fulfill its environmental remediation obligations in the event the project falls through.  See Am. Compl. ¶¶ 162-65, 289-90.  Plaintiffs contend that these changed circumstances require preparation of a supplemental EIS under 40 C.F.R. § 1502.9(c)(1).

_____

[20]    Although the Artesia to Bloomfield pipeline is owned by Williams or one of its corporate relatives, Holly Corporation operates it under a long-term lease with Mid-America Pipeline Company, a Williams subsidiary.  See Defendant-Intervenor's Reply to Plaintiffs' and Plaintiff-Intervenors' Opposition to Cross Motion for Summary Judgment at 6-7 & n.2.

Because the Court finds that BLM did not act arbitrarily or capriciously in declining to prepare a supplemental EIS addressing the expanded Holly Pipeline or the Williams Companies' financial condition, Counts 12 and 13 must fail.

a.   Expansion of the Holly Pipeline (Count 12)

After BLM issued the FEIS and DOI approved Williams' ROW application in the October 2001 ROD, the Holly Corporation announced that it had expanded the capacity of its pipeline from Artesia, New Mexico (site of a Holly-owned refinery) to Bloomfield by approximately 29,000 bpd.  See Schink Decl.  Holly also announced its intention to use the expanded pipeline to supply products to the Salt Lake City market "in the event that proposed third-party pipeline extensions from the Four Corners Area to Salt Lake City are constructed." See Press Release, *Holly Corporation Completes Enhanced New Mexico Distribution System* (Jan. 15, 2002), A.R. vol. 55 at 47J.  Plaintiffs claim that because the expanded Holly pipeline would serve as the primary source of supply for the proposed Williams pipeline, it is a "cumulative action" under 40 C.F.R. § 1508.25(a)(2), whose discovery required BLM to prepare an SEIS.  See Pls'. 2d Mot. Summ. J. at 31-36.

The federal defendants' response is twofold.  First, they argue that because the Williams ROW application already had been approved by the time the expansion of the Holly pipeline came to light, there no longer was any planned or pending "major federal action" for which a supplemental EIS might need to be prepared under NEPA.  See Defs'. 2d Mot. Summ. J. at 23-25.  Second, the federal defendants claim that the expansion of the Holly pipeline did not "present a seriously different picture of the environmental landscape," so as to require

45

preparation of an SEIS.  See id. at 27-28.  Because the Court finds the defendants' first argument

convincing, it need not reach the second.

CEQ regulations require an agency to prepare a supplemental EIS when "there are

significant new circumstances or information relevant to environmental concerns and bearing on

the proposed action or its impacts."  40 C.F.R. § 1502.9.  "Not every change requires [a

supplemental EIS]; only those changes that cause effects which are significantly different from

those already studied require supplementary consideration."  Davis v. Latschar, 83 F. Supp.2d

at 9 (quoting Corridor H Alternatives v. Slater, 982 F. Supp. 24, 30 (D.D.C. 1997)).  The

decision to prepare an SEIS is governed by the "rule of reason" and reviewed by the courts under

the "arbitrary or capricious" standard.  Marsh v. Oregon Natural Resources Council, 490 U.S.

at 373-75 ("An agency need not supplement an EIS every time new information comes to light

after the EIS is finalized.  To require otherwise would render agency decisionmaking

intractable").  Because the decision whether to prepare a supplemental EIS involves technical

issues within the agency's area of expertise, courts generally "defer to the 'informed discretion of

the responsible federal agencies.'"  Id. at 377 (quoting Kleppe v. Sierra Club, 427 U.S. at 412).

Furthermore, because the purpose of an EIS is to inform federal decision-making, an SEIS need

only be prepared "[i]f there remains 'major Federal actio[n]' to occur."  Marsh v. Oregon Natural

Resources Council, 490 U.S. at 374 (quoting 40 C.F.R.§ 1508.27).

NEPA regulations establish that the requirement of "major federal action" may be

satisfied in situations, such as the one presented by the Williams pipeline, where federal

involvement is limited to the approval of a project or issuance of a permit.  See 40 C.F.R.

§ 1508.19.  Because the information about the Holly pipeline expansion came to light *after* DOI

decided to grant Williams' ROW request, however, the Court must consider whether the actions

remaining to BLM and other government entities after issuance of the October 2001 ROD would

constitute "major federal action" that might be informed by further environmental analysis.

There is no single test to determine what constitutes "major federal action." See

Mineral Policy Center v. Norton, 292 F. Supp.2d 30, 54 (D.D.C. 2003) (citing Save Barton Creek

Ass'n v. Fed. Highway Admin., 950 F.2d 1129, 1134 (5th Cir. 1992) and Village of Los Ranchos

de Albuquerque v. Barnhart, 906 F.2d 1477, 1480 (10th Cir. 1990)).  In a situation where federal

involvement is largely confined to authorizing a project, however, the court of appeals has made

clear that:

> [t]he touchstone of whether NEPA applies is discretion. The
> twofold purpose of NEPA is "to inject environmental
> considerations into the federal agency's decision making process
> and to inform the public that the federal agency has considered
> environmental concerns in its decision making process."  Such
> information may cause the agency to modify its proposed action.
> If, however, the agency does not have sufficient discretion to affect
> the outcome of its actions, and its role is merely ministerial, the
> information that NEPA provides can have no affect on the agency's
> actions, and therefore NEPA is inapplicable.

Citizens Against Rails-to-Trails v. Surface Transp. Bd., 267 F.3d 1144, 1151 (D.C. Cir. 2001)

(citations omitted) (quoting Macht v. Skinner, 916 F.2d 13, 18 (D.C. Cir. 1990)); see also

Mineral Policy Center v. Norton, 292 F. Supp.2d at 54-55 & n.31.  Thus, if the actions remaining

to BLM and other federal entities after the ROW grant are "purely ministerial," *or* if the agencies

have no discretion that might usefully be informed by further environmental review, then there is no "major federal action" and no SEIS must be prepared.[21]

Since DOI has granted Williams' ROW application, only two agency actions remain with respect to this project.  First, Williams must provide, and BLM must approve, a Plan of Development ("POD") "detailing how the pipeline and associated facilities will be constructed in compliance with the ROW terms, conditions, and stipulations."  See Oct. 2001 ROD at 5, A.R. vol. 6 at 132; 43 C.F.R. § 2883.3(m); Williams POD, A.R. vol. 7 at 182.[22]  Second, after the POD is approved, BLM will issue a "Notice to Proceed" ("NTP"), allowing construction to commence.  See Oct. 2001 ROD at 5, A.R. vol. 6 at 132.  Issuance of an NTP is conditioned on the POD's inclusion of all required environmental protection measures set forth in the ROD, "to the satisfaction of the agencies."  Id.; see Defs'. 2d Mot. Summ. J. at 31.

BLM's discretion now that the ROW has been approved therefore is limited to determining whether the proposed POD adequately embodies the environmental stipulations set forth in the ROD, and whether Williams is complying adequately with those conditions, so that the NTP may issue.  These actions by BLM are not "purely ministerial" because BLM still retains discretion to halt the Williams project should Williams not meet its environmental obligations. The potential environmental effects of the *Holly* pipeline, however, have no bearing on

---

[21]     The error upon which the Court does remand this matter to BLM for preparation of a supplemental EIS –  BLM's failure to substantiate its finding that the Williams pipeline had "independent utility" from the proposed Equilon project – arose *before* DOI decided to grant Williams' ROW application, a decision that unquestionably constituted a "major federal action" which usefully might be informed by further environmental analysis.  See supra at 42-43.

[22]     BLM regulations give the agency discretion to impose a POD requirement for any right-of-way grant or temporary use permit.  43 C.F.R. § 2882.3(m).

Williams' ability to meet *its own* environmental obligations.  Consequently, BLM reasonably could have concluded that the Holly pipeline expansion was not a new circumstance "bearing on the proposed action or its impacts."  40 C.F.R. § 1502.09.  BLM therefore did not act arbitrarily or capriciously in declining to prepare an SEIS.

Plaintiffs also appear to argue that the Holly pipeline expansion is a "connected action" that BLM should have considered along with the Williams project, either in an SEIS or (had BLM known of the Holly expansion in advance) in the original FEIS under 40 C.F.R. § 1508.25(a), see Reply Brief of Plaintiffs and Plaintiff-Intervenors in Support of Their Motion for Summary Judgement and Opposition to the Federal Defendants and Williams Petroleum Services Cross-Motions for Summary Judgment (April 7, 2003) ("Pls'. Rep. 2d Mot. Summ. J.") at 20.  This argument is without merit.  Unlike the proposed Equilon pipeline project, which would require DOI approval for rights-of-way across federal lands in New Mexico, the Holly pipeline expansion appears to have been an entirely private endeavor involving no federal "action" which might have required an environmental analysis under NEPA.  Consequently, although the Court remands this matter to BLM for preparation of a supplemental EIS on the issue of the proper scope of its environmental analysis, supra at 42-43, this supplemental EIS need not address the Holly pipeline expansion as a "connected action" under 40 C.F.R. § 1508.25(a) because that pipeline involves no "major federal action" subject to NEPA.

    b.   Williams' Financial Situation (Count 13)

Plaintiffs' second argument in support of their position that an SEIS should have been prepared is that "Williams' crippled financial posture severely impairs its ability to meet its

environmental obligations under the FEIS and ROD," and that the emergent possibility that

Williams will abandon its pipeline project without paying for cleanup constitutes a changed

circumstance necessitating preparation of an SEIS.  See Pls'. 2d Mot. Summ. J. at 36.[23]  Plaintiffs

rely on Hughes River Watershed Conservancy v. Glickman, 81 F.3d 437, 448 (4th Cir. 1996), in

which the United States Court of Appeals for the Fourth Circuit held that an EIS's reliance on

severely inflated calculations of a proposed project's economic benefits "violated NEPA because

it impaired fair consideration of the Project's adverse environmental effects."  Plaintiffs argue

that the FEIS prepared by BLM similarly relied on erroneous assumptions about Williams'

financial health, and that an SEIS therefore was necessary to calculate fairly the Williams

project's costs and benefits.  See Pls'. 2d Mot. Summ. J. at 36-39.

Defendants' response is that an SEIS is required only when "there are significant

new circumstances or information relevant to *environmental* concerns and bearing on the

proposed action or its impacts," 40 C.F.R. § 1502.09 (emphasis added), and that Williams'

financial situation simply is not an "environmental concern."  See Defs'. 2d Mot. Summ. J.

at 28-31.  Plaintiffs argue that the possibility Williams will be unable to meet its environmental

obligations is a significant environmental concern; defendants claim that there is only a "highly

speculative and attenuated" connection between Williams' financial situation and any

environmental impact.  See Defs'. 2d Mot. Summ. J. at 29-30.  The Court agrees with

defendants.

---

[23]     The foregoing discussion of the Holly pipeline's significance is not dispositive of
plaintiffs' claim that Williams' deteriorating financial situation required preparation of an SEIS.
Because such new information was arguably relevant to Williams' ability to meet its
environmental obligations, it could have informed BLM's judgment as to whether it should issue
Williams a Notice to Proceed with the pipeline project.

The environmental import of Williams' financial health may be fairly debated. BLM considered the issue and decided that the environmental situation had not changed so significantly that an SEIS was required.  See Defs'. 2d Mot. Summ. J. at 31.  This determination relied on the existence of a two million dollar bond that Williams was required to post as a condition of commencing pipeline construction.  The bond was intended to cover the cost of environmental remediation in the event that Williams became insolvent or was otherwise unable to meet its obligations.  Plaintiffs now claim that the two million dollar bond would be insufficient to cover the potential costs of remediation in the event of Williams' default, offering in support of this contention the declaration of a landscape architect who estimates the probable cost of cleanup to exceed five million dollars.  See Pls'. Rep. 2d Mot. Summ. J. at 22-24; Decl. of Christopher Wade Sands, Ex. B to Pls'. Rep. 2d Mot. Summ. J. (April 2, 2003).

Judicial review of agency action, however, generally is confined to the contents of the administrative record.  See Esch v. Yeutter, 876 F.2d 976,  991 (D.C. Cir. 1989).  "That principle exerts its maximum force when the substantive soundness of the agency's decision is under scrutiny."  Id.  Plaintiffs assert no procedural defect in BLM's determination that a two million dollar bond would cover adequately the potential costs of remediation, nor have they offered any other reason the Court should, in contravention of the normal rule, consider plaintiffs' extra-record evidence on this matter.  Absent any record evidence to the contrary, the Court cannot conclude that BLM acted arbitrarily or capriciously in deciding that, in light of the environmental protections incorporated in the ROW grant and Williams' posting of a two million dollar bond to cover the environmental risk of Williams' insolvency, the environmental situation

had not changed so dramatically as to require preparation of an SEIS.  Accordingly, defendants are entitled to summary judgment on Count 13 of the Amended Complaint.

## C.   *Related Mineral Leasing Act Claim (Count 13)*

In a related argument, plaintiffs also assert that the Mineral Leasing Act ("MLA"), 30 U.S.C. § 185,  requires DOI and BLM, as a condition of granting the right-of-way, to "evaluate whether Williams currently has the financial capability to construct, operate, maintain, and terminate the proposed pipeline project."  See Statement of Points and Authorities in Opposition to Motion of Defendant-Intervenor Williams Pipe Line Company, LLC to Dismiss Count XIII of Plaintiffs and Plaintiff-Intervenors' Amended Complaints at 13.  Plaintiffs cite as authority 30 U.S.C. § 185(j), which requires the Secretary of the Interior or her designee to:

> grant or renew a right-of-way or permit under this section only when [she] is satisfied that the applicant has the technical and financial capability to construct, operate, maintain, and terminate the project for which the right-of-way or permit is requested in accordance with the requirements of this section.

30 U.S.C. § 185(j).  The statute thus lays out with considerable clarity when the Secretary is obligated to assess an applicant's financial situation: when she intends to "grant or renew" a permit or right-of-way.[24]  Yet plaintiffs claim that this section imposes upon the Secretary a *continuing* obligation to assess the financial situation of the recipient of a right-of-way, even after the requested right-of-way has been granted and before it has come up for renewal.

---

[24]     Mineral Leasing Act regulations guarantee periodic renewals of ROWs by dictating that every ROW "be limited to a reasonable term, not to exceed 30 years."  43 C.F.R. § 2881.1-1(e).

52

Rather than formulate an argument for inferring such an obligation from the cited language, plaintiffs merely cite two cases in which courts have entertained challenges to DOI's decision to grant rights-of-way under the Mineral Leasing Act. Both are distinguishable from the instant case, and neither case supports the imposition on the Secretary of the Interior of a continuing obligation to monitor the financial health of right-of-way holders and permittees. In No Oilport! v. Carter, 520 F.Supp 334, 363 (W.D. Wash. 1981), the court heard (and rejected) challenges to the Secretary's *issuance* of a pipeline right-of-way on numerous grounds, including failure to comply with 30 U.S.C. § 185(j). The plaintiff there did not challenge the Secretary's failure to reassess the financial or technical capacity of an applicant once the right-of-way had been granted. The other case cited by plaintiffs, Wilderness Society v. Morton, 479 F.2d 842 (D.C. Cir. 1973), is completely inapposite to this case in that it involved a challenge to the issuance of a pipeline right-of-way for failure to comply with the width restrictions on rights-of-way embodied in 30 U.S.C. § 185(d). The dispositive issue in that case was whether the challenged use grants were even "rights-of-way" within the scope of that section of the Mineral Leasing Act. See Wilderness Society v. Morton, 479 F.2d at 846-47. Thus, neither of plaintiffs' cited cases support their argument.

Plaintiffs' position is untenable in any event. Not only would the obligation to keep abreast of the financial status of all holder of rights-of-way on public land be administratively unthinkable for the agency; the uncertainty associated with allowing BLM to revoke its ROW grants at any time based on a discretionary determination of financial fitness would severely diminish the value of any land use rights granted by DOI. Because plaintiffs can adduce no authority under 30 U.S.C. § 185 or the relevant case law for the proposition that the

Secretary has a continuing duty to assess the financial health of right-of-way recipients, this claim must fail.

D.    *Other Mineral Leasing Act Claims (Counts 9 and 10)*

Counts 9 and 10 of the Amended Complaint claim that in allowing the Williams pipeline project to go forward, DOI and BLM violated the Mineral Leasing Act by "failing to impose adequate provisions to protect the public" and "failing to adequately control and prevent damage to the environment, public and private property and the public health and safety." See Am. Compl. at 67, 69.

The complaint echoes the language of the MLA's implementing regulations, which require any grant of a right-of-way for a pipeline through federal lands to contain stipulations "designed to control or prevent damage to the environment (including damage to fish and wildlife habitat), damage to public or private property, and hazards to public health and safety," as well as "requirements which comply with applicable Federal and State law that will protect the safety and health of pipeline workers and the general public, including, but not limited to, protection against the sudden rupture and slow degradation of the pipeline."  43 C.F.R. § 2881.2(b)(3), (c).  Although the complaint conclusorily asserts that the October 12, 2001 ROD granting Williams' request for a right-of-way does not meet these requirements, the only specific hazard it claims the ROD leaves the environment and the public exposed to is that of pipeline rupture due to the passage of the pipeline through landslide-prone areas of the San Juan and Manti-LaSal National forests.  See Am. Compl. ¶¶ 261-62.

By contrast, the briefs submitted in connection with the motions for summary judgment make no mention whatsoever of this claim, suggesting that plaintiffs have now abandoned their claims under the MLA.  This decision was well-advised, as the administrative record shows them to be untenable.  Appendix A to the October 12 ROD sets forth numerous standards and stipulations designed to mitigate the project's environmental effects.  The ROD also incorporates protection measures outlined in FWS's Biological Opinion, which include corrosion protection for the pipeline; regular pipeline inspections including aerial patrols, on-ground inspection of water crossings, ground-based patrols of the right-of-way, and scheduled inspection of all pipeline valve locations and surface facilities; internal inspection of the pipeline; an automated leak detection system; and a spill response plan.  See Bio. Op. at 6-7, A.R. vol. 6 at 40-41.  These measures and others are incorporated into the POD for the Williams project, issued in 2001.  See Plan of Development, Williams Refined Products Pipe Line Project Ch. 4 (Sep. 2001), A.R. vol. 7 at 219-65.  And Williams still must demonstrate compliance with the conditions of the POD before construction may proceed.

DOI, the agency charged with implementation of the Mineral Leasing Act, considered these conditions sufficient to meet the requirements of the MLA.  In view of the numerous mitigation and environmental protection measures incorporated into the ROD, and of the considerable deference afforded to DOI in the application of the Mineral Leasing Act and of DOI's own regulations, plaintiffs' claims under the Mineral Leasing Act must fail.

E.   *National Forest Management Act Claims (Counts 14, 15 and 16)*

Counts 14, 15, and 16 of the Amended Complaint challenge the Forest Service's

August 3, 2001 ROD, amending the Forest Plan for the Manti-LaSal National Forest.  See Am.

Compl. ¶¶ 171-76, 295-99.  Plaintiffs challenge this action on two primary grounds: first, that the

amendment violates Section 294.12(a) of USFS's "Roadless Area Rule," and second, that USFS

acted arbitrarily and capriciously in finding that the forest plan amendment was "non-

significant."

The National Forest Management Act of 1976 ("NFMA") requires the Secretary

of Agriculture to "develop, maintain, and, as appropriate, revise land and resource management

plans for units of the National Forest System."  16 U.S.C. § 1604(a).  This planning requirement

is implemented with respect to each individual national forest by development of a Forest Plan, a

broad, programmatic document that establishes planning goals for each forest or group of forests,

and provides standards and guidelines for the management of forest resources.  See 36 C.F.R.

§ 219.4(b)(3); 36 C.F.R. § 219.10-12.  The NMFA and its implementing regulations require that

the Forest Service incorporate into the development of each forest plan a public review process

substantially more involved than that contemplated by NEPA.

Forest plans must be revised at least once every 15 years, but also may be

amended at the Regional Forester's discretion.  See 36 C.F.R. § 219.10(f), (g).  Each amendment

is subject to the public review process required for newly developed forest plans unless the

Regional Forester makes a "finding of non-significance" ("FONSA") with respect to the

proposed amendment, in which case the amendment may be implemented "following appropriate

public notification and satisfactory completion of NEPA procedures," but without the more

elaborate review process required for the issuance of a new forest plan.  36 C.F.R. § 219.10(f).[25]

The existing forest plan for the Manti-La Sal National Forest, issued in 1986,

provided for a "utility corridor" through the forest in which the construction of natural gas or

petroleum products pipelines might be authorized.  The Williams FEIS recommended that

sections of the existing corridor be re-routed to avoid areas of high landslide risk.  See FEIS

§§ 2.3.3 to 2.4 at 2-62 to 2-66.  After issuance of the FEIS, USFS's amendment of the forest plan

proceeded in two stages.  In a July 5, 2001 ROD the utility corridor was first re-routed with

respect to natural gas pipelines, after which on August 3, 2001, USFS issued another ROD re-

routing the corridor for petroleum products pipelines.  Each ROD included a finding of non-

significance for the proposed change, allowing the amendments to proceed without the full-scale

environmental review required for the issuance of new forest plans.

---

[25]     Former 36 C.F.R. § 219.10(f) reads, in its entirety:

> Amendment. The Forest Supervisor may amend the forest plan.
> Based on an analysis of the objectives, guidelines, and other
> contents of the forest plan, the Forest Supervisor shall determine
> whether a proposed amendment would result in a significant
> change in the plan. If the change resulting from the proposed
> amendment is determined to be significant, the Forest Supervisor
> shall follow the same procedure as that required for development
> and approval of a forest plan. If the change resulting from the
> amendment is determined not to be significant for the purposes of
> the planning process, the Forest Supervisor may implement the
> amendment following appropriate public notification and
> satisfactory completion of NEPA procedures.

Former C.F.R. 219.10(f), 47 Fed. Reg. 43026 (Sep. 30, 1982).

Plaintiffs administratively challenged the August 2001 ROD on the same grounds asserted in this litigation.  The Acting Deputy Regional Forester rejected plaintiffs' challenge, relying in part on plaintiffs' failure to challenge administratively the July 2001 ROD amending the Manti-La Sal Forest Plan with respect to the Questar and Kern River utility corridors.  The federal defendants here argue for rejection of plaintiffs' challenge to the August 2001 ROD on the same grounds, asserting that because plaintiffs failed to exhaust their administrative remedies, they cannot now challenge USFS's original decision to re-route the utility corridor in the Manti-La Sal National Forest.  See Defs'. 2d Mot. Summ. J. at 3-4.

Although the Court ultimately finds that the ROD did not violate the Roadless Area Rule, it finds defendants' exhaustion argument to be of questionable validity.  In the first place, the July 2001 ROD stated specifically that "[t]his decision is not subject to administrative appeal," July 2001 ROD at 30, A.R. vol. 51 at 30, while the August 2001 ROD stated that it was subject to appeal pursuant to 36 C.F.R. § 217.3.  See Aug. 2001 ROD at 7, A.R. vol. 51 at 41. Moreover, the July 2001 ROD stated that "[USFS's] decision regarding the natural gas pipelines, does not affect any decisions relative to the Williams Petroleum refined product pipeline."  July 2001 ROD at 9, A.R. vol. 51 at 9.  Given these clear statements of the independence and unappealability of the July 2001 ROD, plaintiffs can hardly be faulted for not taking an appeal from that decision as a prerequisite to challenging the August 2001 ROD.

1.   Derogation of Forest Service's Duty (Count 14)

Count 14 of the Amended Complaint claims that USFS's August 2001 ROD improperly failed to consider the impact of the Williams pipeline on soils, aquatic and wildlife

resources, drinking water supplies, and human health and safety.  See Am. Compl. ¶¶ 295-99.

Although the FEIS addresses each of these issues in considerable detail, see FEIS § 3.1.1.5

at 3-24 to 3-40, plaintiffs argue that USFS acted improperly by "deferring" to BLM's

environmental analysis, in violation of the NFMA, NEPA, and the Forest Service's own

regulations.  See Pls'. 2d Mot. Summ. J. at 18-19.

This argument, however, is fatally inconsistent with NEPA regulations, which

provide that in the environmental review of a project implicating the jurisdiction of multiple

federal agencies, it is appropriate for a single ("lead") agency to take primary responsibility for

the preparation of the EIS, and for other ("cooperating") agencies to collaborate in and rely upon

that analysis.  See 40 C.F.R. §§ 1501.5, 1501.6, 1506.3; Utahns for Better Transp. v. United

States DOT, 319 F.3d 1207, 1210 (10th Cir. 2003); Silentman v. Federal Power Comm'n, 566

F.2d 237, 240 (D.C. Cir. 1977); Anacostia Watershed Society v. Babbitt, 871 F. Supp. at

485 & n.8.  USFS was designated as a cooperating agency with respect to the Williams FEIS, see

65 Fed. Reg. 21006, 21006, and participated in scoping decisions and other aspects of the

environmental review process.  Consequently, it was fully entitled to rely on the FEIS prepared

with BLM as lead agency.  See 40 C.F.R. § 1506.3; Anacostia Watershed Society v. Babbitt, 871

F. Supp. at 485 & n.8.[26]  Count 14 of plaintiffs' complaint therefore fails.

---

[26]      Plaintiffs do not challenge the sufficiency of USFS's decision to adopt the FEIS under 40 C.F.R. § 1506.3.

2.    Roadless Area Rule (Count 15)

Plaintiffs claim that USFS's August 3, 2001 ROD violated USFS's Roadless Area

Rule, 36 C.F.R. § 294.12, by authorizing road construction in inventories roadless areas of the

Manti-La Sal National Forest.  See Pls'. 2d Mot. Summ. J. at 20.

In 2000, USFS designated for special protection a set of areas in national forests

demonstrating such valuable properties as high air or soil quality, habitat for threatened,

endangered, or sensitive species, or importance to public drinking water supplies.  See 36 C.F.R.

§ 294.11.  USFS regulations prohibit (with certain exceptions not at issue here) the construction

of roads in such "inventoried roadless areas."  36 C.F.R. § 294.12(a).  The proposed Williams

pipeline route passes through inventoried roadless areas in the Manti-La Sal National Forest.  At

issue is whether the pipeline construction activities contemplated by the ROD in these areas

include the building of any "roads" as defined by the regulations.

Forest Service regulations define a "road" as a "motor vehicle travelway over 50

inches wide, unless designated and managed as a trail."  36 C.F.R. § 294.11.  The August 2001

Forest Service ROD states that "[n]o road construction or temporary road construction is

proposed within inventoried roadless areas . . . on National Forest Lands."  See August 2001

ROD at 5, A.R. vol. 51 at 39.  As explained by the FEIS, "no temporary or permanent roads

would be authorized by the [Forest Service] in inventoried roadless areas in support of

construction in a utility corridor . . . equipment and vehicles needed to support pipeline

construction and reclamation would be authorized to travel within the pipeline corridor in a

defined 'construction zone' which would not be considered a road."  FEIS § 3.1.3.2 at 3-49.

Plaintiffs contest USFS's definition of a "road" to exclude the construction zones contemplated

by the FEIS, asserting that the construction procedures described therein "clearly will result in road building."  See Pls'. 2d Mot. Summ. J. at 21; FEIS at 2-44 to 2-47.

The Forest Service appears to interpret the term "motor vehicle travelway" in the regulatory definition of a "road" not to include the construction zones contemplated here, despite the acknowledged presence of motorized vehicles in the area (which will, of necessity, move within the zone).  Although the interpretation proffered by the Forest Service perhaps is not the most intuitive one, it is true that the *primary* purpose of the construction right-of-way is not motor vehicle travel, but construction activity and (after the pipeline is completed) environmental reclamation.  Moreover, because so little of the pipeline route traverses roadless areas, and that route is accessible by existing roads, it is reasonable to assume that construction zones within the roadless areas will not serve as transit corridors for construction vehicles seeking access to other parts of the pipeline route.

The Roadless Area Rule was promulgated by USFS.  USFS's interpretation of those regulations therefore is entitled to considerable deference.  Thomas Jefferson Univ. v. Shalala, 512 U.S. at 512; Wyoming Outdoor Council v. United States Forest Serv., 165 F.3d at 52.  Here, USFS's interpretation of the term "road" to exclude the construction zones contemplated by the ROD and FEIS is not plainly erroneous or inconsistent with the regulation, and will not be overturned.

3.   Finding of Non-Significant Amendment (Count 16)

Plaintiffs claim that USFS acted arbitrarily and capriciously in finding in the August 2001 ROD "that permitting liquid petroleum to be transported through the Manti-La Sal

Forest for the first time was 'non-significant.'" <u>See</u> Pls'. 2d Mot. Summ. J. at 25.  The record, however, demonstrates that USFS discharged its duty adequately.

Plaintiffs' arguments rely, in part, on a misinterpretation of the scope of the amendment made to the Forest Plan.  The amendment was not, as plaintiffs claim, a "decision to permit the construction of pipelines carrying refined petroleum products into the Manti-La Sal National Forest." <u>See</u> Pls'. 2d Mot. Summ. J. at 26.  The only change wrought by the amendment was the re-routing of an existing utility corridor to avoid landslide-prone areas.  It was not (as plaintiffs maintain) USFS's task to determine whether the construction of a petroleum products pipeline in the Manti-La Sal National Forest would be "significant"; petroleum products could flow through the forest (via the prior, more landslide-prone route) even in the absence of any amendment to the Forest Plan.  For better or worse, the decision to allow construction of pipelines had been made years before, and is not a matter of controversy in this suit.  USFS was responsible for determining only whether the *change* in the pipeline route constituted a significant amendment.

Although Forest service regulations do not define "significance" for purposes of forest amendments, USFS's Land and Resource Management Planning Handbook does provide some guidance.  The Handbook states that in making such decisions USFS should consider the timing, location, and size of the proposed change; the proposed change's effect on the goals, objectives, and outputs of the forest plan; and whether the proposed change is of a systematic nature, or would only affect a particular situation or area covered by the plan.  United States Forest Service, Land and Resource Management Planning Handbook, Ch. 5.32, FSH

§ 1909.12 (1992).  In the July 2001 ROD USFS considered each of these factors as they related to the proposed change in the utility corridor route, finding the amendment non-significant because: (1) the Forest Plan for the Manti-La Sal National Forest would be revised within a few years; (2) the total acreage affected by the rerouting of the corridor would be about 72 acres, less than .006% of the total forest planning area; (3) the proposed change would "facilitate movement toward the desired future conditions and/or forest-wide goals stated in the forest plans;" and (4) the proposed changes to the forest plan would be specific rather than systemic in application. See July 2001 ROD at 24-27, A.R. vol. 51 at 24-27.

The FONSA analysis in the August 2001 ROD relies on the reasoning set forth in the July 2001 ROD, and also discusses briefly the effect of the petroleum products corridor's re-routing on the achievement of forest plan goals.  See Aug. 2001 ROD at 6, A.R. vol. 51 at 40. Given the narrow scope of the amendment to the Forest Plan, USFS's thorough discussion of the handbook factors, and plaintiffs' failure to point to any substantive flaw in that analysis, the Court cannot consider USFS's finding of non-significance arbitrary or capricious.  See former 36 C.F.R. § 219.10(f), 47 Fed. Reg. 43026 (committing determination of significance to Forest Supervisor's judgment); Sierra Club v. Cargill, 11 F.3d 1545, 1548 (10th Cir. 1994) ("Applying the deferential standard is especially important where, as here, the agency determination is extremely fact bound.").

F.   *Endangered Species Act Claim* (Count 11)

Count 11 of plaintiffs' amended complaint asserts that FWS acted arbitrarily and capriciously by issuing a Biological Opinion ("BO") regarding the Williams project that was

"defective" under the standards of Section 7 of the Endangered Species Act ("ESA"), 16 U.S.C.

§ 1536.  See Am. Compl. ¶¶ 271-77.  The source of the alleged defect is the BO's failure to

provide "baseline population data" to support its conclusions regarding the project's effect on the

Colorado pikeminnow, razorback sucker, humpback chub, and bonytail, four endangered fish

species likely to be impacted by construction of the Williams pipeline.  Id. ¶ 274.  Plaintiffs

appear to have abandoned this claim, however, as it was not briefed by any party in the motion to

dismiss or in any of the motions for summary judgment.  Defendants have, however, moved for

summary judgment as to all claims, and even if the issue has not been briefed directly, the Court

will grant summary judgment for defendants because it finds plaintiffs' claims to be meritless.

Section 7 of the ESA requires each federal agency, in consultation with the

Secretary of the Interior, to "insure that any action authorized, funded, or carried out by such

agency . . . is not likely to jeopardize the continued existence of any endangered species or

threatened species."  16 U.S.C. § 1536(a)(2).  During a formal consultation process under the

ESA, it is the responsibility of (in this case) FWS to "[e]valuate the current status of the listed

species or critical habitat," "[e]valuate the effects of the action and cumulative effects on the

listed species or critical habitat,"and "[f]ormulate its biological opinion as to whether the action,

taken together with cumulative effects, is likely to jeopardize the continued existence of listed

species or result in the destruction or adverse modification of critical habitat."  50 C.F.R.

§ 402.14(g).  The biological opinion provided by FWS must include "(1) A summary of the

information on which the opinion is based; (2) A detailed discussion of the effects of the action

on listed species or critical habitat; and (3) The Service's opinion on whether the action is likely

to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat. . ."  50 C.F.R. § 402.14(h).

Plaintiffs have adduced no authority to support the proposition that in evaluating "the current status of any endangered species or habitat" in a biological opinion, FWS specifically must include current baseline population data, whether or not those data exist.  The regulations state that it is FWS's responsibility to use "the best scientific and commercial data *available*" in formulating its opinion.  50 C.F.R. § 402.14(g)(8) (emphasis added).  FWS adequately has discharged that responsibility in this case with respect to each of the four endangered fish species listed in the complaint.

As to each fish species, the BO provides extensive data on the species' general historical population, life cycle (including its reproductive behavior in the rivers potentially affected by the Williams project), population dynamics, critical habitat, and current status and distribution.  As to the population of the Colorado pikeminnow, although the BO does not provide a population estimate for the entire affected area, FWS does provide specific abundance data regarding those areas for which such data are available, and more general estimates regarding those areas for which data are unavailable.  See Bio. Op. at 13-15, 31-33, A.R. vol. 6 at 44-49, 64-66.  Specific population estimates for the humpback chub likewise were "difficult to obtain because of low numbers of fish and recapture rates," but the BO provides the best estimates available.  See id. at 28, A.R. vol. 6 at 61.  Relatively little data are provided on the bonytail, perhaps owing to its status as "the rarest native fish in the Colorado River."  See id. at 30, A.R. vol. 6 at 63.  The BO does, however, describe efforts in 2000 and 2001 to stock more than 81,000 bonytail in the Colorado River.  The success of those efforts could hardly have been

ascertained by the time the BO was prepared in June 2001, but those data do describe adequately the current status of the bonytail.  Finally, as to the razorback sucker, the BO does provide specific population estimates.  See Bio. Op. at 21-22, 32-33, A.R. vol. 6 at 55-56, 65-66.

Given the extensive attention the BO devotes to the current status of the four affected fish species, FWS can hardly be said to have violated its responsibility to prepare a biological opinion under 16 U.S.C. § 1536 and 50 C.F.R. § 402.14.  The Court therefore will grant summary judgment for defendants on Count 11 of the complaint.

G.   *Bad Faith (Count 7)*

In Count 7 of the Amended Complaint, plaintiffs claim that DOI and BLM violated NEPA by failing to evaluate the environmental consequences of the Williams pipeline in good faith.  See Am. Compl. ¶¶ 244-51.  They claim that because BLM viewed Williams as a "customer," it failed to consider the environmental impact of Williams' proposal objectively and "tailor[ed] its NEPA process to support a pre-determined result."  Id. ¶ 247.

In determining whether an agency has adequately complied with NEPA, the Court's task is "to determine whether the EIS was compiled with objective good faith and whether the resulting statement would permit a decisionmaker to fully consider and balance the environmental factors."  Sierra Club v. Adams, 578 F.2d 389, 394 (D.C. Cir. 1978) (quoting Sierra Club v. Morton, 510 F.2d 813, 819 (5th Cir. 1975)); see also Friends of the River v. Federal Energy Regulatory Comm'n, 720 F.2d 93, 120 (D.C. Cir. 1983);  Calvert Cliffs' Coordinating Committee v. United States Atomic Energy Comm'n, 449 F.2d 1109, 1115 (D.C. Cir. 1971) (reviewing court's responsibility is to determine whether, in following the "careful

and informed decisionmaking process" called for by NEPA, an agency conducted its analysis "fully and in good faith."); Williams v. Dombeck, 151 F. Supp.2d 9, 42 (D.D.C. 2001).  Even when augmented by the extra-record evidence proffered by plaintiffs, the accusations of bad faith lodged against BLM are completely unsupportable.

Plaintiffs rely on five facts to prove their claim of bad faith:  first, that BLM in two internal communications (of the hundreds circulated in the course of the review process) referred to Williams as its "customer," and once referred to a "commitment" it had to Williams; second, that BLM officials assisted Williams in preparing the revised ROW application submitted in March 2000 (allegedly to assist Williams in circumventing NEPA requirements); third, that BLM erroneously informed Congressman James V. Hansen that Williams had supply commitments in Bloomfield and never corrected that misstatement, despite having been informed of the inaccuracy by Williams; fourth, that BLM withheld certain documents requested by plaintiffs under the Freedom of Information Act; and fifth, that BLM sent to EPA a letter falsely purporting to confirm that, in a conference call between BLM and EPA officials on July 3, 2001, BLM had satisfied EPA's objections to the FEIS.  See Pls'. 1st Mot. Summ. J. at 32-36; Aug. 2001 Wisely Letter, A.R. vol. 10 at 203.  Plaintiffs attempt to substantiate the last allegation with an affidavit from Clint W. Ensign, Vice-President for Government Relations at Sinclair Oil.  See Affid. of Clint W. Ensign, Ex. N to Pls'. 1st Mot. Summ. J.  Mr. Ensign's affidavit describes a meeting between Ensign and two named EPA officials, who purportedly told Ensign that EPA had not changed its position with respect to segmentation in the FEIS, and that the BLM letter did not accurately reflect the EPA officials' recollection of the conference call.  See id. ¶¶ 5-10.

Each of these facts either is without significance or is subject to a more innocuous interpretation than plaintiffs would have the Court apply.  First, the Court notes that "customer" appears to be BLM's preferred term for those who avail themselves of BLM services.  See, e.g. Bureau of Land Management: What We Do, http://www.blm.gov/nhp/what/index.htm#customer ("The Bureau of Land Management is dedicated to better serving you, our customer. Customer Service is one of our highest priorities, and it calls for putting customers first and striving for a 'customer-driven government' that matches or exceeds the best service available in the private sector.").  Second, the Court likewise sees nothing untoward in BLM's offer of assistance to a long-term "customer" in its attempts to satisfy BLM requirements for ROW applications.  Third, that BLM communicated erroneous information to Congressman Hansen seems more indicative of BLM's own confusion as to Williams' supply situation than of any intent to deceive a member of Congress, especially as there was no direct connection between Congressman Hansen's concerns about the Williams project and DOI's discretionary decision to approve the ROW application.  Fourth, plaintiffs' assertion that BLM withheld documents under the FOIA in bad faith is completely implausible and unsupportable.  Before the FOIA request was litigated, BLM delivered 3500 pages of documents to plaintiffs, withholding *only three* letters and/or their attachments.  See Parker v. BLM, 141 F. Supp.2d 71, 75 (D.D.C. 2001).  When plaintiffs did sue under the FOIA, this Court found that only one of the documents had been withheld improperly . Id. at 74.

Finally, although there is some question as to whether BLM accurately reported the substance of the conference call in its letter to EPA, see Aug. 2001 Wisely Letter, A.R. vol. 10 at 203, this fact does not suggest bad faith by BLM.  The letter to EPA is consistent with

68

internal communications suggesting that BLM and DOI perceived EPA's concerns to have been assuaged by the conference call.  See E-mail from Kristina Clark, Department of the Interior, to LaVerne Steah, Bureau of Land Management (July 30, 2001), A.R. vol. 10 at 222 ("I just want to flag the great outcome in our conference call with EPA.  Loosely characterized, I would say BLM and EPA had a miscommunication.  We cleared it up in the call and the issues raised by EPA are inapplicable.").  Whether BLM was overly optimistic in its interpretation of the conference call, it is too much to suggest that BLM engaged in an elaborate effort (including fabricated internal communications) to misrepresent the substance of a single phone call with EPA.  Moreover, the single affidavit plaintiffs offer to substantiate this claim of bad faith is based entirely on hearsay and in any event does not provide specific enough information to permit the Court to conclude that BLM misrepresented the substance of the call.  If BLM truly had misrepresented the call in its letter to EPA, it would be curious that no corrective response from EPA appears in the record, and that plaintiffs could produce no first-hand testimony from any EPA official about the communication.

Because plaintiffs have provided no unambiguous facts or evidence to substantiate their accusations of bad faith, Count 7 of the amended complaint fails.

## III.   CONCLUSION

Plaintiffs have achieved success on the merits with respect to only one of their claims: that BLM acted arbitrarily and capriciously in finding the Williams pipeline segment to have independent utility, and that BLM therefore improperly segmented its analysis in violation of NEPA and CEQ regulations.  Plaintiffs have not demonstrated that the FEIS failed to address

any environmental impact of the Williams pipeline itself; or that there were other defects in either DOI's grant of Williams' ROW application, USFS's amendment of the Manti-La Sal Forest Plan, or FWS's Biological Opinion on the Williams project.  The only proven defect of the FEIS was its failure to substantiate the decision to restrict the scope of the analysis to exclude the Equilon pipeline.

Except with respect to Count 1, asserting improper segmentation of the EIS, plaintiffs have failed to demonstrate that BLM, DOI, USDA, or USFS abrogated any of their duties under NEPA, the APA, the ESA, the MLA, or the NMFA.  With respect to the improper segmentation of the EIS, the Court remands the matter to BLM for the preparation of a Supplemental Environmental Impact Statement addressing only the issue of whether the Williams and Equilon pipeline projects are "connected actions" under 40 C.F.R. § 1508.25(a)(1).  If BLM concludes that the actions are not connected, it shall substantiate with concrete evidence, beyond that already set forth in the administrative record, the claim that the Williams pipeline has "independent utility" from the Equilon project, or other circumstances indicating with reasonable clarity that the Williams pipeline will not rely on the proposed Equilon pipeline as a source of petroleum products.

The Court issued an Order consistent with this Opinion on March 31, 2005.


/s/_____
PAUL L. FRIEDMAN
United States District Judge


DATE: May 13, 2005

70